STATE OF CONNECTICUT *v.* WILLIAM L.[1]
(AC 31383)

Harper, Lavine and Flynn, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued November 9, 2010—officially released February 8, 2011

*Elizabeth M. Inkster*, senior assistant public defender, with whom was *Joseph Abraham*, special public defender, for the appellant (defendant).

*Kathryn Ward Bare*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Roger S. Dobris*, senior assistant state's attorney, for the appellee (state).

LAVINE, J. The defendant, William L., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in a spousal relationship in violation of General Statutes § 53a-70b. On appeal, the defendant claims that the trial court impermissibly admitted into evidence (1) testimony regarding a laboratory report in violation of *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and (2) testimony in violation of the constancy of accusation doctrine. We affirm the judgment of the trial court.

Given the evidence presented at trial, the jury reasonably could have found the following facts. On September 5, 2007, the defendant resided in an apartment belonging to his estranged wife (victim),[2] who permitted him to live there in a separate bedroom because he had no money and no place to live.[3] The couple's daughter and the victim's son from a prior relationship also lived in the apartment.

On the morning of September 5, 2007, the victim walked her daughter to the bus stop for the first day of school, shopped for groceries at Shaw's Supermarket (Shaw's) and returned to the empty apartment at approximately 11 a.m. The defendant arrived ten minutes later and entered the kitchen. He told the victim that he had been looking for work and was supposed to start a job later that day. The victim informed the defendant that she was not happy and that he had three months to find his own place to live. The defendant responded with anger. He and the victim discussed their relationship and the prospect of separating. Before entering the living room, the defendant threw his keys

---

[2] The defendant and his wife were divorced subsequent to the sexual assault at issue in this case.

[3] The victim was employed as a day care provider.

at the victim and told her to watch her back. The victim went into her bedroom and shut the door.

A few moments later, the defendant entered the victim's bedroom without warning and struck her with the back of his hand, knocking her onto her bed. The victim testified that the defendant had a crazed look about him and punched her in the face as she lay on her side. The victim attempted to resist the defendant's assault, testifying that she "wasn't going down without a fight . . . ." The defendant, however, overpowered her by pressing his right forearm against her neck and telling her not to move. The defendant also told the victim that he would kill her if he did not get what he wanted, which the victim understood to mean to have sexual intercourse with him. In an effort to let the defendant calm down, the victim told him that she was menstruating and asked if she could get a towel because she did not want the blanket to be soiled. The defendant agreed and released the victim from his hold. When the victim got up, the defendant did as well and positioned himself between the victim and the door, while the victim placed a towel on the bed. The defendant told the victim, "You know what you have to do; do it." The victim sat there without moving and told the defendant that she did not want to have sex. The defendant became enraged.

The defendant held a knife to the victim's neck and said, "I'll kill you . . . . [Y]our baby [is] going to find you either dead or like a vegetable." The victim lay down on the bed because she did not want to die. The defendant asked the victim, "Do you want to go ahead and give me any," to which she replied, "no . . . ." The defendant ripped the victim's underwear and sanitary pad from under her dress, threw them on the floor, pulled down his pants and inserted his penis into her vagina. The assault lasted between two and five minutes, during which time he ejaculated. When the

defendant was finished, he cleaned his penis, which was covered with menstrual blood, with a blue towel. Before he left the room, the defendant turned to the victim, smirked, and said, "don't jump out the window," and that he would be back.

When the victim heard the defendant leave the apartment, she got up, put on a clean sanitary napkin and underwear, straightened the bed and attempted to clean the carpet, which had been soiled by the sanitary pad thrown on the floor. She telephoned her son and told him that she had been raped. Her son arrived moments later. The victim did not telephone the police because she did not feel safe in her house and was afraid that the defendant would return and hurt her.

After he left the apartment, the defendant walked to Shaw's and approached Douglas Harkins, a police sergeant with the New Haven police department who was working a private duty assignment at Shaw's. The defendant told Harkins that he wanted to be arrested. When Harkins asked the defendant why he wanted to be arrested, the defendant stated that he was having trouble finding a job, his marriage was in trouble and that he had a recent argument with his wife. The defendant further stated that he had "popped" his wife and forced her to have sexual intercourse with him.[4] Harkins

---

[4] The relevant portion of the transcript reveals the following examination of Harkins by the prosecutor:

"Q. After he said that?

"A. He then went on to say that he had forced—he had forced his wife to have—to have sex with him, but that she was on her period and he didn't care.

"Q. Okay. And did you then inquire further as to what he meant by popping her?

"A. Yes, sir. I—

"Q. And what did he say?

"A. I asked him, you know, what do you mean by—what do you mean by popped her? I didn't know whether he meant he shot her or stabbed her or whatever the case is. What do you mean by you popped her? He says— he says—he made a striking motion as—like a boxer, like a punch. And I said, okay. And I said, well, is she okay? And said, yeah, she's fine. And I

asked about the victim's welfare and where she lived. He then called police dispatch and had an officer sent to the victim's apartment.

Paul Cavalier, a New Haven police officer, responded to the apartment where he found the victim and her son, who were both visibly upset. When Cavalier informed the victim that he had received a report of domestic violence, the victim told him that she had been raped. Cavalier observed slight swelling on the right side of the victim's face. Two additional police officers arrived and questioned the victim. Thereafter, she was transported to a nearby hospital emergency room, where she was examined and evidence was collected in a rape kit.

Louis Rivera, a New Haven police officer, responded to Shaw's where he arrested the defendant and transported him to the police station. Before being transported, the defendant handed a knife to Michael Towles, a private security guard working at Shaw's, stating, "I better not take this with me." At the police station, after being informed of his constitutional rights, the defendant agreed to give a statement. Renee J. Luneau, a detective, asked the defendant some preliminary questions. She testified, however, that when she turned on a recording device, the defendant told her that he did not want the interview recorded, stating, "what's the point, I did it, I'm guilty." Luneau further testified that the defendant told her that "rather than going somewhere else [for sex], he took it from" the victim and that he "wanted to scar [the victim's] face."

The defendant did not present evidence at trial but argued to the jury that he had consensual sexual intercourse with the victim. After the jury found the defendant guilty of sexual assault in a spousal relationship,[5]

said, well, where do you live? And he says 40 . . . Street. And so at that point I called the dispatcher."

[5] General Statutes § 53a-70b (b) provides in relevant part: "No spouse . . . shall compel the other spouse . . . to engage in sexual intercourse

the court sentenced him to fourteen years incarceration and six years of special parole. This appeal followed.

## I

The defendant first claims that the court impermissibly admitted into evidence testimony regarding a laboratory report in violation of the hearsay strictures governing the confrontation clause as set forth in *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 318–19.[6] *Mel-*

by the use of force against such other spouse . . . or by the threat of the use of force against such other spouse . . . which reasonably causes such other spouse . . . to fear physical injury."

[6] Briefly, "[t]he Massachusetts courts . . . admitted into evidence affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine. The question presented is whether those affidavits are 'testimonial,' rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 307.

"The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment . . . provides that [i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him. In *Crawford* [v. *Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)] . . . we held that it guarantees a defendant's right to confront those who bear testimony against him. . . . A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Id., at 54." (Citations omitted; internal quotation marks omitted.) *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 309.

In *Crawford*, the Supreme Court described "the class of testimonial statements covered by the Confrontation Clause . . . Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (Emphasis in original; internal quotation marks omitted.) Id., 309–10.

The Supreme Court concluded with respect to the laboratory results regarding the cocaine, "not only were the affidavits made under circumstances which would lead an objective witness reasonably to believe that

*endez-Diaz* was decided by the United States Supreme Court subsequent to the defendant's conviction. We need not decide whether the dictates of *Melendez-Diaz* were violated at the defendant's trial because we conclude that, even if the defendant's right to confrontation was violated, any alleged violation was harmless beyond a reasonable doubt.

The following additional facts and procedural history are relevant to the defendant's claim. When the victim was taken to the hospital, Heather Gilluly, an emergency department nurse, examined the victim and collected evidence, including vaginal swabs, with a rape kit. The rape kit was sent to the state police forensic laboratory in Meriden, where the police department refers evidence for analysis. At trial, the state asked Luneau about the results of the laboratory testing of the rape kit.

Initially, the defendant objected on the ground of hearsay to the state's question, "[d]o you know what the lab report stated concerning the vaginal smear taken by [n]urse Gilluly of [the victim]?" The court sustained the defendant's objection. Thereafter, the state questioned Luneau to lay a foundation to enter evidence under the business record exception to the hearsay rule, namely, that the police department routinely relies on reports from the state police forensic laboratory.

the statement would be available for use at a later trial, [*Crawford* v. *Washington*, supra, 541 U.S. 52], but under Massachusetts law the *sole purpose* of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance . . . . We can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose—as stated in the relevant state-law provision—was reprinted on the affidavits themselves. . . .

"In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were witnesses for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to be confronted with the analysts at trial." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 311.

Again, the defendant objected, claiming that the foundation was inadequate. In voir dire, the defendant asked Luneau about her participation, or lack thereof, in the preparation of the laboratory report and contended that Luneau could not testify about the results of the testing because she was not involved in the testing. Again, the state claimed that the report was admissible under the business record exception to the hearsay rule. After consulting § 8-4 of the Connecticut Code of Evidence, the defendant conceded that the report was admissible and withdrew his objection. Thereafter, the state asked Luneau what the testing demonstrated about the vaginal smear. Luneau testified that spermatozoa were identified in the vaginal smear.[7]

On appeal, the state contends that the defendant's claim is not reviewable because he waived it by withdrawing his foundation objection at trial. The defendant, however, argues that his claim was preserved because his objection to Luneau's lack of familiarity with the laboratory testing was the functional equivalent of a confrontation clause objection. Moreover, he argues, new constitutional rights are to be applied retroactively when they arise between trial and appeal, citing *Griffith* v. *Kentucky*, 479 U.S. 314, 328, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987); see also *State* v. *Evans*, 165 Conn. 61, 69, 327 A.2d 576 (1973) (reviewing unpreserved claims constituting exceptional circumstances). We need not decide whether the defendant's claim was preserved for appeal, and we do not disagree that new constitutional claims are reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Assuming, without deciding, that the defendant's claim is reviewable pursuant to *Golding*, the defendant cannot prevail because the state has demonstrated that any claimed error was harmless beyond a reasonable doubt.

[7] The state did not offer the laboratory report into evidence.

"[A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances."[8] (Emphasis in original.) Id.

"When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . [W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Citation omitted; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 460, 996 A.2d 251 (2010).

To demonstrate that the defendant was guilty of sexual assault in a spousal relationship, the state had to prove beyond a reasonable doubt that he compelled the victim, who was his wife, to engage in sexual intercourse by the use of force against her or by the threat of the use of force against her, which reasonably caused the victim to fear physical injury. See General Statutes § 53a-70b. The victim claimed that the defendant sexually assaulted her on September 5, 2007. The defendant

---

[8] By resolving the defendant's claim on the fourth prong of *Golding*, we do not imply that the defendant has satisfied the second and third prongs of the doctrine, as we do not reach them. The record, however, is adequate for our review.

presented no evidence at trial but argued to the jury that the sexual intercourse that he had with the victim on that day was consensual.

In its brief on appeal, the state points out that it had the burden to prove, under § 53a-70b, that sexual intercourse between the defendant and victim took place. The laboratory results about which Luneau testified were evidence of sexual intercourse. The issue for the jury to decide was whether the defendant compelled the victim to have sexual intercourse by the use of force or the threat of the use of force that reasonably caused the victim to fear physical injury. The presence of spermatozoa on the vaginal swab was evidence of sexual intercourse only, not of the use of force. Whether force was used was a determination for the jury to make.[9] We, therefore, conclude that Luneau's testimony regarding the results of the laboratory testing was harmless beyond a reasonable doubt.

## II

The defendant's second claim is that the court impermissibly admitted the testimony of two of the state's witnesses, concerning statements made by the victim, that violated the rule regarding constancy of accusation established in *State* v. *Troupe*, 237 Conn. 284, 304, 677 A.2d 917 (1996) (en banc).[10] The plaintiff cannot prevail

[9] Moreover, our review of the transcript reveals that Harkins testified in front of the jury that, shortly after the incident, the defendant told him that "he had forced his wife to have . . . sex with him . . . ." See footnote 4 of this opinion.

[10] In *Troupe*, our Supreme Court concluded that "a person to whom a sexual assault victim has reported the assault may testify only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator. In all other respects, our current rules remain in effect. Thus, such evidence is admissible only to corroborate the victim's testimony and not for substantive purposes. Before the evidence may be admitted, therefore, the victim must first have testified concerning the facts of the sexual assault and the identity of the person or persons to whom the

on this claim.[11]

The following procedural history pertains to the defendant's claim. On the day evidence was to commence, the defendant presented the court with an eleven point motion in limine. The motion in limine stated in relevant part: "The defendant seeks rulings regarding the following anticipated areas of state's evidence: 1. any evidence from any purported 'constancy of accusation' witness that may extend beyond the scope of proper testimony as set forth in § 6-11 (c) of the [Connecticut] Code of Evidence, *State* v. *Troupe*, [supra, 237 Conn. 284] and/or *State* v. *Samuels*, 75 Conn. App. 671 [817 A.2d 719 (2003), rev'd on other grounds, 273 Conn. 541, 871 A.2d 1005 (2005)]; see, testimony of [victim's son]."

During oral argument on the defendant's motion, the defendant represented to the court that he anticipated that the victim's son would be the only constancy of accusation witness. The prosecutor disagreed and stated that Cavalier, the first responding officer, also would be a constancy of accusation witness. The court inquired of the prosecutor how many constancy of accusation witnesses he anticipated. The prosecutor responded that he anticipated two witnesses, the victim's son and Cavalier. When the court asked defense counsel whether there was anything further regarding point one of the motion in limine, defense counsel

incident was reported. In determining whether to permit such testimony, the trial court must balance the probative value of the evidence against any prejudice to the defendant." *State* v. *Troupe*, supra, 237 Conn. 304–305.

In coming to its conclusion, our Supreme Court noted that "[o]f course, the rule that we adopt today does not affect those cases in which the details of a sexual assault complaint are otherwise admissible, as, for example, in the case of a spontaneous utterance or in the case of a prior consistent statement admitted to rebut a claim of recent fabrication." Id., 304 n.19.

[11] The state claims that the defendant waived his right to raise this claim. We do not need to decide whether the defendant waived his claim, as we resolve the claim on other grounds.

responded, "[n]o, Your Honor." Thereafter, the court ruled: "That motion pursuant to *Troupe* and *Samuels*, and based upon what I've heard from the state's attorney, is granted."

At trial, Cavalier, who was dispatched to the victim's home in response to the defendant's having told Harkins that he "popped" his wife and forced her to have sex, testified as follows in response to the prosecutor's question regarding what the victim reported to him in terms of the sexual assault complaint he was investigating: "She reported that she was sexually assaulted." Defense counsel did not object to the question or ask that the response be stricken. In response to the prosecutor's question about why this case stood out, Gilluly testified that "the patient claimed to have been sexually assaulted by her spouse."[12] The defendant did not object to the questions on the basis of constancy of accusation or move to have the responses stricken.[13]

"Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. Practice Book [§§ 60-5 and 5-5]; *State* v. *Rothenberg*, 195 Conn. 253, 262, 487 A.2d 545 (1985); *State* v. *Braman*, 191 Conn. 670, 684–85, 469 A.2d 760 (1983). The reason for this rule is clear: it is to alert the trial court to an error while there is time to correct it; *State* v. *Rothenberg*, supra, 263; *State* v. *Jones*, 193 Conn. 70, 88, 475 A.2d 1087 (1984); and to give the opposing party an opportunity to argue against the objection at trial. To permit a party to raise a different

---

[12] Defense counsel objected to the question on the ground that the witness was vouching for her own credibility. The prosecutor responded that it was not vouching but an explanation as to why Gilluly remembered this patient among the thousands she has treated. Defense counsel then objected to the question on the basis of relevance. The court overruled the objection.

[13] On appeal, the defendant relies on his motion in limine for preservation. In his motion, he did not identify either Cavalier or Gilluly, and he did not object when the prosecutor identified those witnesses as the state's constancy of accusation witnesses.

ground on appeal than was raised during trial would amount to trial by ambuscade, unfair both to the trial court and to the opposing party. *State* v. *Brice*, 186 Conn. 449, 457, 442 A.2d 906 (1982) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Baptiste*, 114 Conn. App. 750, 769, 970 A.2d 816, cert. granted on other grounds, 294 Conn. 910, 983 A.2d 274 (2009). Because the defendant failed to object to the testimony and the state was not granted an opportunity to argue against the objection, the claim is not reviewable.[14]

The defendant, however, seeks review pursuant to the plain error doctrine. See Practice Book § 60-5. "The plain error doctrine is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved, are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that [an appellate court] invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . .

---

[14] "Although [our Supreme Court's] decision in *Troupe* restricted the constancy of accusation doctrine, [our Supreme Court] also held that *Troupe* does not affect those cases in which the details of a sexual assault complaint are otherwise admissible . . . . *State* v. *Kelly*, 256 Conn. 23, 40–41, 770 A.2d 908 (2001). Even if the court improperly admitted evidence as constancy of accusation testimony, [w]e can sustain a right decision although it may have been placed on a wrong ground. *Stapleton* v. *Lombardo*, 151 Conn. 414, 417, 198 A.2d 697 (1964)." (Internal quotation marks omitted.) *State* v. *Samuels*, supra, 75 Conn. App. 706 (*Dranginis, J.*, dissenting).

"[I]n cases of sexual abuse . . . hearsay statements made in the course of medical treatment which reveal the identity of the abuser, are reasonably pertinent to treatment and are admissible. . . . *State* v. *DePastino*, 228 Conn. 552, 565, 638 A.2d 578 (1994)." (Internal quotation marks omitted.) *State* v. *Samuels*, supra, 75 Conn. App. 711 (*Dranginis, J.*, dissenting).

In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Internal quotation marks omitted.) *State* v. *Edwin M.*, 124 Conn. App. 707, 714–15, 6 A.3d 124 (2010).

On the basis of our review of the evidence at trial, we conclude that this is not one of those extraordinary situations calling for the reversal of the judgment of conviction. Moreover, the defendant has failed to explain how he has been aggrieved by the testimony in question, particularly in light of his admission to Harkins, and others, that he forced the victim to have sexual intercourse.

The judgment is affirmed.

In this opinion the other judges concurred.