******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* CASEY SINCLAIR
(AC 38366)

Lavine, Keller and Beach, Js.

*Argued January 3—officially released May 9, 2017*

(Appeal from Superior Court, judicial district of
Waterbury, Crawford, J.)

*John L. Cordani, Jr.*, assigned counsel, with whom
was *Damian K. Gunningsmith*, for the appellant
(defendant).

*Jennifer F. Miller*, deputy assistant state's attorney,
with whom, on the brief, were *Maureen Platt*, state's
attorney, and *Don E. Therkildsen, Jr.*, senior assistant
state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Casey Sinclair, appeals from the judgment of conviction, rendered after a jury trial, of one count of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b). The defendant claims that (1) the trial court abused its discretion by admitting into evidence testimonial hearsay in violation of his constitutional right to confrontation, (2) the prosecutor committed multiple acts of impropriety, and (3) the court abused its discretion in admitting into evidence inadmissible "guilt by association" evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant lived in the Bronx, New York and owned Sinclair Enterprises, a business that sold used cars. Between October, 2012, and February, 2013, the defendant and his girlfriend, Winsome Lawrence, drove to Connecticut approximately nine or ten times in a Jeep to go to a mall in Waterbury. On February 5, 2013, as they did on every other trip, the defendant drove the Jeep to Lawrence's house, and Lawrence drove the Jeep to Waterbury while the defendant sat in the passenger seat.

When they arrived in Waterbury, the defendant told Lawrence to get off the highway at an exit and directed her to a side road. Shortly thereafter, a black vehicle parked on the same side of the road. The defendant opened the center console of the Jeep, pulled a string, and took out two white parcels of heroin. He gave the bags to an individual in the black vehicle and walked back to the Jeep with money in his hands. On his way back to the Jeep, the defendant saw a marked police vehicle, and he threw the money into a bush. Lawrence drove the defendant to a nearby gas station. At the gas station, she heard the defendant say on his cell phone, "Jay, come and pick me up . . . I'm going back for the money." The defendant then went into the gas station, telling Lawrence that he needed to get a black bag. After he returned to the Jeep, the black vehicle mentioned previously came and picked up the defendant. The defendant left the gas station for approximately ten minutes.[1] When he returned, he had a black bag filled with money, and he told Lawrence to drive to the mall.

Earlier that day, at approximately 4:30 p.m., a detective with the Waterbury Police Department received an anonymous tip that "activity" was going to take place that night in Waterbury.[2] The detective relayed this information to Gary Angon, a sergeant with the Waterbury Police Department. On the basis of the tip, Angon assigned the officers in his unit to survey the area around the mall. At approximately 8 p.m., Angon saw the Jeep. He radioed the officers, telling them that he had observed a vehicle that fit the description of the

one that they were looking for. Angon pulled the Jeep over, and the defendant appeared more nervous than most people who interact with the police because he kept looking up and down the street and hesitating when answering Angon's questions. Angon asked the defendant who owned the Jeep, and the defendant replied that "it was his friend's."

Shortly thereafter, James Dickey, a detective with the Waterbury Police Department, and Bella, Dickey's narcotics detection canine, conducted a narcotics detection sweep of the Jeep. Bella alerted Dickey to the center console of the Jeep, and Dickey and Eric Medina, an officer with the Waterbury Police Department, found a number of prepackaged bags of heroin and a black bag filled with money in a trap in the center console. The defendant and Lawrence were placed under arrest.

The defendant was charged with possession of narcotics with intent to sell by a person who is not drug-dependent.[3] During the state's case-in-chief, Angon testified about the police surveillance that ended with the arrests of the defendant and Lawrence. He also testified, over the defendant's objection, that during the course of his investigation, he learned that the Jeep had been inspected at Manny's Auto Repair, which was located next to Sinclair Enterprises, the defendant's place of business, in New York. Medina testified that he recovered approximately 10,000 bags of heroin, stored in ten bricks, that were worth approximately $45,000 to $60,000 and a black bag filled with cash worth $12,248 in the Jeep. Charmaine Henriques, Lawrence's cousin, testified that she had spoken with the defendant after the incident, and he told her that he "was trying a thing and g[ot] fucked."

Lawrence testified for the state,[4] describing the drug transaction and the events that took place at the gas station. Lawrence also testified that the Jeep belonged to the defendant. The state introduced into evidence a videotape that depicted Lawrence, the defendant, and the black vehicle at the gas station. The videotape also showed the driver of the black vehicle, and Angon testified, over the defendant's objection, that he recognized him as Terrence Saunders, a known heroin dealer.

The defendant testified on his own behalf that, contrary to Lawrence's testimony, he and Lawrence had only driven to Connecticut on two occasions, the second time being the night on which they were arrested. He testified that on the night of the arrest, he and Lawrence were going to a casino but decided to stop by the mall for dinner. Later, on direct examination, he contradicted himself, testifying that they went to Connecticut to meet a man named Paul because Paul wanted to sell a vehicle to him. He testified that Paul was in the black vehicle that picked him up at the gas station, but that there were also two other men in the

vehicle whom the defendant did not know. He denied ever seeing the narcotics or the money in the Jeep prior to their discovery by the police. He also denied owning the Jeep, testifying that the Jeep belonged to Lawrence.

On January 30, 2015, the jury found the defendant guilty of possession of narcotics with intent to sell by a person who is not drug-dependent. The court sentenced the defendant to eight years imprisonment, five years of which were mandatory. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court violated his right to confrontation when it admitted into evidence Angon's testimony that the Jeep was inspected at Manny's Auto Repair, located next to the defendant's business in the Bronx, New York. Specifically, the defendant argues that evidence of the inspection information was inadmissible testimonial hearsay and that admitting the evidence was not harmless error because the inspection location was a critical piece of evidence linking the defendant to the Jeep. The state argues that the evidence was not testimonial hearsay, and even if it was, the state showed that the error was harmless beyond a reasonable doubt. We conclude that even if the defendant's right to confrontation was violated, any violation was harmless error.

The following additional facts are relevant to this claim. Angon testified on direct examination that, on the basis of his training and experience, a drug dealer often uses a vehicle he owns during a drug transaction but registers it in someone else's name. The dealer will also have someone else drive the vehicle in order to "avoid any connection with the drug." He also testified that narcotics are often transported from New York to Waterbury. The state then introduced into evidence a printout detailing the Jeep's registration information, but neither the place of inspection nor a code that related to the place of inspection was included on the printout.[5] Relying on the printout, Angon testified that the Jeep was registered in New York to a man named Victor A. Manana. The state asked Angon where the Jeep was inspected, and defense counsel objected on the ground of hearsay because Angon would be testifying about "information he gleaned somewhere else." The court overruled the objection, and Angon testified that the Jeep was inspected at Manny's Auto Repair, which was a business located adjacent to the defendant's business, Sinclair Enterprises.

The defendant questioned Angon during cross-examination about how he obtained the inspection information. Angon replied that sometime in the last two days, someone in his "office contacted New York State police to see if they could translate . . . the information that's on the printout." Outside the presence of the jury, the

defendant moved to strike any and all of Angon's testimony relating to the Jeep's inspection information. The defendant argued that Angon's testimony was hearsay because Angon testified about information he obtained from someone in his office who obtained it from an unidentified individual in New York. He also argued that admitting the evidence violated *Crawford*.[6] The state argued that a New York officer had merely translated a "somewhat confusing registration document . . . ." The court denied the motion to strike.

During his case, the defendant testified that Manny's Auto Repair was located on a lot next to Sinclair Enterprises, but that the properties were separated by a fence and that he did not have any ownership interest in Manny's Auto Repair. On cross-examination, however, he admitted that he used Manny's Auto Repair to perform repairs on the used cars he sold. The state also put into evidence Sinclair Enterprises' Internet site that advertised it as a "used car service and auto repair facility located in the Bronx."

On appeal, the defendant argues that the court violated his constitutional right to confrontation when it admitted Angon's inspection testimony. The defendant argues that Angon's testimony was hearsay because he obtained the inspection information from an unknown individual working in his office who obtained the information from someone working for the "New York State police," and the inspection information was used to prove the truth of the matter asserted. He also argues that the evidence was testimonial in nature because Angon received the information during the course of his investigation, and the primary purpose of the investigation was to prove events relevant to a criminal prosecution. The defendant contends that the state failed to meet its burden of showing that the constitutional violation was harmless beyond a reasonable doubt because a critical component of the state's case was linking the defendant to the Jeep, and without the inspection information, the case "rose and fell on Lawrence's testimony and her credibility." We disagree with the defendant and conclude that even if the court abused its discretion in admitting Angon's testimony, the state met its burden of showing that any evidentiary error was harmless.

We will assume, without deciding, that the court abused its discretion in allowing Angon to testify as to where the Jeep was inspected because the evidence was testimonial hearsay. "When an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *William L.*, 126 Conn. App. 472, 481, 11 A.3d 1132, cert. denied, 300 Conn. 926,

15 A.3d 628 (2011). "That determination must be made *in light of the entire record* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Mitchell*, 296 Conn. 449, 460, 996 A.2d 251 (2010).

"Whether such error is harmless in a particular case depends upon a number of factors, such as [1] the importance of the witness' testimony in the prosecution's case, [2] whether the testimony was cumulative, [3] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, [4] the extent of cross-examination otherwise permitted, and, of course, [5] the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) *State* v. *Smith*, 289 Conn. 598, 628, 960 A.2d 993 (2008).

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond *all* possible doubt . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 267, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007). Moreover, "[i]n determining whether the defendant is guilty, it is the sole right of the jury as the trier of the facts to draw all reasonable and logical inferences from the facts as it finds them to exist. . . . [I]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 195, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997).

To demonstrate the defendant's guilt, the state was required to prove that the defendant possessed and intended to sell the narcotics found in the Jeep. See General Statutes § 21a-278 (b). The main issue in the case was whether the defendant had constructive possession of the narcotics.[7] "[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . [When] . . . the [narcotics are] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact." (Internal quotation marks omitted.) *State* v. *Mangual*, 311 Conn. 182, 215, 85 A.3d 627 (2014). "[K]nowledge of the presence of narcotics and control may be proved circumstantially. . . . In situations in which the putative offender is not in exclusive possession of the premises where the narcotics are found, we may not infer that he or

she knew of the presence of the narcotics or that he or she had control over them, without incriminating statements or circumstances to support that inference." (Internal quotation marks omitted.) *State* v. *Slaughter*, 151 Conn. App. 340, 346–47, 95 A.3d 1160, cert. denied, 314 Conn. 916, 100 A.3d 405 (2014).

Angon's testimony regarding the Jeep's inspection was meaningful because it provided circumstantial evidence that the defendant may have had an ownership interest in the Jeep, which, in turn, supports the proposition that he knew about and had control over the narcotics. After an examination of the *entire record*, however, we conclude that the state has proved that the error was harmless beyond a reasonable doubt because the overall strength of the state's case shows that the inspection information did not have a tendency to influence the judgment of the jury.

The state presented a significant amount of evidence which directly, or indirectly, supported the charge that the defendant knowingly possessed the narcotics in the Jeep. Lawrence testified that she observed the defendant take two white parcels out from the center console of the Jeep and engage in a drug transaction with an individual in a black vehicle. After the transaction, the defendant threw money into a bush and told her to drive to a gas station. At the gas station, she heard him say on his cell phone, "Jay, come and pick me up . . . I'm going back for the money." The defendant told her to park near a wall. He then went inside the gas station and eventually returned to the Jeep. Then, the previously mentioned black vehicle arrived and picked up the defendant. She testified that when he returned, he had a black bag filled with cash.

The state also presented the video recorded at the gas station, which depicted the following events. A tan Jeep with New York license plates parked in a lit area of the side parking lot. Approximately ten minutes later, the Jeep drove to the opposite side of the gas station and parked near a wall in an area with no lighting. While on his cell phone, the defendant exited the Jeep, purchased a soda from within the gas station, and returned to the Jeep. Approximately three minutes later, a black vehicle parked in front of the gas station. The defendant exited the Jeep and entered the backseat of the black vehicle without shaking hands, introducing himself, or otherwise acknowledging the individuals in the vehicle, whom he claimed not to know. Approximately ten minutes later, the black vehicle returned and parked next to the Jeep, which was still in the unlit area of the parking lot, and the defendant exited the black vehicle and went back into the Jeep. In addition, the state presented evidence that the police recovered $12,248 worth of cash in the Jeep, and, on the basis of Medina's testimony that there was $45,000 to $60,000 worth of narcotics in the Jeep, the jury reasonably could

have found that two bricks of narcotics was worth approximately $12,000. This supports Lawrence's testimony that she saw the defendant take out of the center console and sell two parcels of narcotics.

"Whether [a witness'] testimony [is] believable [is] a question solely for the jury. It is . . . the absolute right and responsibility of the jury to weigh conflicting evidence and to determine the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Rodriguez*, 93 Conn. App. 739, 751, 890 A.2d 591 (2006), appeal dismissed, 281 Conn. 817, 917 A.2d 959 (2007). The jury was free to credit Lawrence's testimony over the defendant's testimony and draw any reasonable inferences from it. Moreover, any inconsistencies in Lawrence's testimony were fully explored by defense counsel on cross-examination and during closing argument.

The state also presented other incriminating evidence against the defendant in addition to Lawrence's testimony. The videotape showed that the driver of the black vehicle was a known heroin dealer and that the narcotics found in the Jeep were heroin. The anonymous tip that the police received revealed that "activity" was going to take place in Waterbury, and, on the basis of the contents of the tip, the police were instructed to survey the area around the mall to look for a Jeep with New York license plates. The police located the defendant near the mall in a Jeep with New York license plates. When Angon pulled the Jeep over, the defendant appeared more nervous than the average person who interacts with the police. See *State* v. *Williams*, 110 Conn. App. 778, 788, 956 A.2d 1176 (defendant's "nervous" and "fidgety" behavior one factor in finding that defendant constructively possessed narcotics), cert. denied, 289 Conn. 957, 961 A.2d 424 (2008). When questioned by the police about who owned the Jeep, the defendant stated that the Jeep belonged to "a friend," and at the police station, he asked Lawrence, "what did you tell police." A few weeks later, he told Henriques that "I was trying a thing and I g[ot] fucked." He also told Henriques that Lawrence was not involved in the incident, but gave Henriques $4000 to bail Lawrence out of jail. After Lawrence was released from custody, the defendant promised her that he would pay for her rent, although he never gave her any money.

The defendant's own testimony may have been damaging to his case. He testified that he and Lawrence were on their way to a casino, but then contradicted himself and testified that they were actually going to Connecticut to speak to a man named Paul about purchasing a vehicle. In response to the prosecutor's question, "[the mall is in] the opposite direction of the casino, [r]ight?" the defendant responded that he did not know how to get to the casino from Waterbury. The defendant stated that he did not know Paul's last

name or any of the other occupants in the black vehicle. He also testified that it took only ten minutes for the defendant to be driven to the place where the used vehicle was, inspect the vehicle, decide not to purchase the vehicle because he and Paul could not agree on a price, and be driven back to his Jeep.

The state also presented evidence that supported its theory that the defendant was a drug dealer and was using Lawrence to separate himself from the narcotics. See *State* v. *Slaughter*, supra, 151 Conn. App. 348 (detective's testimony that defendant's actions "were consistent with the behaviors of drug sellers and purchasers" constituted evidence that defendant had intent to sell contraband). Angon testified that, on the basis of his training and experience, it was common practice for drug dealers, in order to distance themselves from the contraband, to register their vehicles in someone else's name, have someone else drive the vehicle, and transport the narcotics from New York to Waterbury. Lawrence's testimony and the registration printout[8] showed that the defendant's actions comported with this practice: the defendant drove the Jeep to Lawrence's house, but had Lawrence drive the Jeep from the Bronx to Waterbury, and the Jeep was registered to Victor A. Manana. In addition, the defendant testified that in November, 2013, Lawrence purchased two cell phones and gave one to the defendant, but registered both phones under her name, and the defendant paid her directly for his phone. On cross-examination, he admitted that he could not recall how many cell phones he had with him on the night of the arrest, testifying that he did not "think [he] had two cell phones" with him.

We acknowledge the dissent's concern that the prosecutor used the inspection information during closing argument to prove the state's theories that the defendant owned the Jeep and that his actions comported with those of a drug dealer. The inspection information, however, was not the only piece of evidence the prosecutor used in closing argument to prove these propositions. The prosecutor relied heavily on Lawrence's testimony that the defendant owned the Jeep and that he drove it to her house on nine or ten occasions. He also used the fact that the Jeep was not registered in the defendant's name. The prosecutor's use of the inspection information was confined to a relatively small portion of his closing argument, and the vast majority of it was dedicated to bolstering Lawrence's credibility and undermining the defendant's credibility. When one considers the cumulative force of *all* of the evidence that the state presented to prove the defendant's guilt and the impact that *all* of the evidence had on the jury, which is the most important consideration in our harmlessness analysis, we believe the state is able to meet this burden. See *State* v. *Smith*, supra, 289 Conn. 628 ("[m]ost importantly, we must examine the impact of the evidence on the trier of fact and the result

of the trial" [internal quotation marks omitted]).

On the basis of our review of the entire record, we conclude that even if the court abused its discretion by admitting Angon's testimony, the state has shown that any error was harmless beyond a reasonable doubt.

## II

## A

### Analysis of Claimed Improprieties

The defendant's second claim is that the prosecutor committed multiple acts of impropriety during closing and rebuttal argument to the jury. Specifically, the defendant claims that the prosecutor committed twelve acts of impropriety that fall into five categories: (1) arguing facts not in evidence; (2) putting a false choice to the jury that it must "disbelieve" the testimony of Henriques, Angon, and Medina in order to find the defendant not guilty, which the defendant claims constitutes a violation of *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002); (3) disparaging the integrity and role of defense counsel; (4) commenting on the credibility of Lawrence; and (5) appealing to the emotions and passions of the jury.[9] We agree with the defendant that the prosecutor committed impropriety when he put a "false choice" to the jury, and when he disparaged the integrity and role of defense counsel, but, nevertheless, find that the improprieties were harmless.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 552, 78 A.3d 828 (2013).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 611, 65 A.3d 503 (2013). "[B]ecause closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. [I]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Mucha*, 137 Conn. App. 173, 194, 47 A.3d 931, cert. denied, 307 Conn. 912, 53 A.3d 998 (2012).

1

*Singh* Violation

The defendant claims that the prosecutor impermissibly argued to the jury that it must disbelieve the testimony of Henriques, Angon, and Medina in order to believe the testimony of the defendant. We agree with the defendant in regard to Angon's and Medina's testimony.[10]

During his rebuttal argument, the prosecutor stated that "[y]ou have to disbelieve Sergeant—and you can, you completely judge credibility. *But you have to disbelieve . . . Henriques, Sergeant Angon, Medina, and you have to believe* [*the defendant*]. I submit to you the evidence doesn't show [t]hat." (Emphasis added.)

"[A] witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong. Moreover, closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper." (Footnote omitted.) *State* v. *Singh*, supra, 259 Conn. 712. "[A] prosecutor's argument could make this suggestion to the jury without using the word 'lying.' " *State* v. *Albino*, 312 Conn. 763, 787, 97 A.3d 478 (2014). "The reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof. . . . Moreover . . . such arguments preclude the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Internal quotation marks omitted.) *State* v. *Tate*, 85 Conn. App. 365, 371, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004). However, "when the prosecutor argues that the jury must conclude that one of two versions of *directly conflicting testimony* must be wrong, the state is leaving it to the jury to make that assessment." (Emphasis added.) *State* v. *Albino*, supra, 787.

We conclude that the prosecutor's comment was improper because he argued to the jury that it was *required* to find the testimony of Angon and Medina mistaken or wrong in order to believe the testimony of the defendant.[11] See id., 788 (comment improper because it precluded jury from crediting both state's witnesses and defendant or from reconciling evidence state claimed was in direct conflict). The state argues that the prosecutor "simply highlight[ed] [to the jury] that the parties had presented irreconcilable contrasting proofs" and, therefore, the prosecutor left it to the jury to decide who was more credible. This is an inaccurate characterization of the testimony. The jury could have reconciled the defendant's testimony with that of Angon and Medina, as almost nothing in the record indicates that their testimony was in direct conflict.[12] Thus, the prosecutor was not merely pointing out a necessary inference that the jury must make, but

instead, gave the jury a false choice between believing Angon and Medina or believing the defendant. See *State* v. *Grant*, 286 Conn. 499, 544, 944 A.2d 947 (comment that jury would have to " 'choose to disbelieve' " two detectives proper because prosecutor pointed out necessary inference jury must make from defense counsel's closing argument), cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008).

2

### Disparagement of the Integrity and Role Of Defense Counsel

The defendant claims that the prosecutor disparaged the integrity and role of defense counsel during rebuttal argument to the jury with two separate comments. The state appears to concede that the first comment was improper but argues that the second comment was not. We agree with the defendant that both comments were improper.

First, the prosecutor stated, "[s]o, here the state's Hobson's choice, our conundrum, if we don't put into evidence up to the lab, defense can argue, oh, my God, they didn't test anything. Oh, my God, what are they doing. Just like he did with the black bag, right, and then we do send the stuff up there, we know we're not gonna get stuff, *usually they use that against us*, right . . . ." (Emphasis added.) Second, the prosecutor stated: "When you think about [Lawrence's] testimony, think about the manner in which I ask questions, even consider how I was talking. *And think about the rocket-fire questions from defense counsel. Was he trying to trip her up? Was he trying to put words in her mouth?*" (Emphasis added.)

"[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . [I]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 82–83, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

The state appears to concede that the "usually they use that against us" comment was improper. See *State* v. *Young*, 76 Conn. App. 392, 404, 819 A.2d 884 (prosecutor's comment that defense counsel's argument was " 'always a favorite argument' " of defense attorneys improper), cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003); *State* v. *Brown*, 71 Conn. App. 121, 129, 800

A.2d 674 (prosecutor's comment that defense counsel's argument was " 'smoke screen' " that all defense attorneys employ as usual defense tactic improper), cert. denied, 261 Conn. 940, 808 A.2d 1133 (2002). We agree.

The question becomes whether the second comment was improper. The defendant argues that the comment was improper because the comment implied that defense counsel tried to "elicit false testimony through trickery" when he vigorously cross-examined Lawrence. The state argues that the prosecutor was only responding to defense counsel's argument, which "focused exclusively on . . . the manner of [Lawrence's] responses to questions." This comment presents a close call. For purposes of our analysis, we will assume, without deciding, that the comment was improper.

## B

### Due Process Analysis

Because we conclude that the prosecutor committed improprieties, we now turn to the second step of our two part analysis. In making our determination, we are guided by the factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). "These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Martinez*, 319 Conn. 712, 736, 127 A.3d 164 (2015). "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012). Applying the *Williams* factors, we conclude that the defendant was not deprived of his right to due process because he failed to show that, in light of the entire trial, the improprieties were so egregious that they amounted to a denial of due process.

The first factor, which is whether the comments were invited by defense counsel, does not weigh in favor of either party. The defendant did not invite the prosecutor to make the *Singh* violation comment because neither defense counsel's theory of the case nor closing argument pertained to the credibility of Angon or Medina.[13] See *State* v. *Stevenson*, 269 Conn. 563, 593, 849 A.2d 626 (2004) (comment invited because defendant's theory of case was that police lied). The defendant also did not invite the prosecutor to make the "usually they use that

against us" comment because defense counsel never argued that the prosecutor engaged in common tactics employed by prosecutors. See *State* v. *Brown*, supra, 71 Conn. App. 130–31 (comment invited because defense counsel mentioned tactics that all prosecutors employ in criminal cases). Defense counsel, however, invited the prosecutor to make the "trying to trip her up" comment. Defense counsel argued during closing argument about Lawrence's demeanor on the witness stand, calling her "unsophisticated," "not . . . very intelligent," and asserting that she did not "have a very good understanding of anything that's going on around her." The prosecutor was free to explain why Lawrence may have had trouble answering defense counsel's questions.

The second factor, which is whether the improprieties were severe, weighs in favor of the state. Defense counsel did not object to or ask for curative instructions for the *Singh* violation comment or to the "usually they use that against us" comment. "[D]efense counsel's failure to make a contemporaneous objection [or ask for curative instructions] certainly permits an inference that counsel did not think the impropriety was severe, and that it is in part the responsibility of counsel that the impropriety went uncured." *State* v. *Grant*, 154 Conn. App. 293, 328, 112 A.3d 175 (2014), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). We recognize that defense counsel did object to the "trying to trip her up" comment, and he asked the court for a curative instruction, which the court denied. The existence of an objection, however, is not the sole factor in our determination of whether an impropriety was severe. "Beyond defense counsel's failure to object, in determining the severity of prosecutorial impropriety, we look to whether the impropriety was blatantly egregious or inexcusable." *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007). We do not find this comment so blatantly egregious as to warrant reversal of the defendant's conviction.

The third factor, which is the frequency of the comments, weighs in favor of the state. The prosecutor made three impermissible comments, and they were all confined to his rebuttal argument. See *State* v. *Franklin*, 162 Conn. App. 78, 105, 129 A.3d 770 (2015) (comment proper because prosecutor made remarks only once in each of his initial and rebuttal closing arguments), cert. denied, 321 Conn. 905, 138 A.3d 281 (2016). The fourth factor, which is whether the comments pertained to a critical issue in the case, does not clearly weigh in favor of either party. A critical issue in the case was the veracity of Lawrence and the defendant. The "usually they use that against us" comment did not pertain to this issue. The *Singh* violation comment and the "trying to trip her up" comment related to this issue because the prosecutor directly attacked the credibility of Lawrence and the defendant.

The fifth factor, which is the strength of the curative measures adopted, does not weigh in favor of either party. Defense counsel did not object to the *Singh* violation comment or the "usually they use that against us" comment. *State* v. *Grant*, supra, 154 Conn. App. 328. Defense counsel, however, objected to the third comment, and the court failed to give a curative instruction. It should be noted that the court, in fact, sustained the defendant's objection. See *State* v. *Warholic*, 278 Conn. 354, 401, 897 A.2d 569 (2006) (court took curative measures when it sustained defense counsel's objections). It also gave the jury specific instructions about weighing the testimony of accomplices.[14] Finally, the sixth factor, which is the strength of the state's case, weighs in favor of the state. As discussed previously, the state had a relatively strong case against the defendant.

After an examination of the *Williams* factors in the context of the entire trial, we conclude that the defendant was not deprived of his right to a fair trial because there was no reasonable likelihood that the jury would have returned a different verdict absent the improprieties.

### III

The defendant's third claim is that the court abused its discretion when it allowed Angon to testify that he knew that Saunders, the driver of the black vehicle, was a known heroin dealer. Specifically, the defendant argues that this was inadmissible "guilt by association" evidence. The state claims that the evidence was properly admitted because it was "relevant and probative" to show possession and intent to sell the narcotics. We agree with the state.

The following additional facts are relevant to this claim. Before the state presented its evidence, the defendant informed the court that he had learned that the state intended to elicit testimony from Angon that he, after reviewing the videotape, recognized the driver of the black vehicle as Saunders because he had arrested Saunders in 2012, for the "sale of heroin in the Waterbury area." The defendant made a motion in limine to preclude the evidence because there was no evidence that the defendant knew Saunders. The state argued that the information was relevant to show the defendant's intent to sell and possession of the narcotics. The court denied the motion in limine, but noted that the defendant could object to the testimony once the state offered to put it into evidence.

During the state's case-in-chief, Angon testified that he viewed the videotape and recognized the man driving the black vehicle as Saunders. He did not testify as to how he knew Saunders. The next day, Lawrence testified. At the conclusion of her testimony, the state asked permission from the court to recall Angon to testify as to how he knew Saunders. The state argued

that in light of Lawrence's testimony, the identity of Saunders as a known heroin dealer was relevant to whether the defendant had possessed and intended to sell narcotics. The defendant argued that the evidence was irrelevant because there was no evidence presented that the defendant personally knew Saunders. The court ruled that the state was not allowed to elicit testimony concerning any details of Saunders' 2012 arrest, but it could elicit testimony that Angon knew Saunders to be a known heroin dealer.

At the end of the state's case-in-chief, the state recalled Angon outside the presence of the jury to make an offer of proof. Angon testified that on the basis of his training and experience, he knew that Saunders was a known heroin dealer in Waterbury. The defendant objected to the question, but the court ruled that on the basis of Lawrence's testimony, Angon's proffered testimony was relevant to show possession and intent to sell the narcotics, and that the evidence was more probative than prejudicial. The state recalled Angon, and he testified that he knew Saunders to be a known heroin dealer.

On appeal, the defendant argues that the court abused its discretion in allowing Angon to testify that Saunders was a known heroin dealer. The defendant contends that his testimony was inadmissible "guilt by association" evidence because there was no evidence presented that the defendant knew Saunders. The defendant argues that admitting the testimony was harmful because the state's case was not strong independent of the evidence. We disagree.

"As an initial matter, we review a court's decision to admit or to exclude evidence under a deferential standard, i.e., whether the court's ruling was an abuse of discretion." *State* v. *Reese*, 77 Conn. App. 152, 160, 822 A.2d 348, cert. denied, 265 Conn. 910, 831 A.2d 252 (2003).

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *State* v. *Kantorowski*, 144 Conn. App. 477, 487–88, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013). "Relevant evidence is excluded, however, when its probative value is outweighed by the danger of unfair prejudice." *State* v. *Ferguson*, 260 Conn. 339, 359, 796 A.2d 1118 (2002).

We conclude that the court did not abuse its discre-

tion in finding that Angon's testimony regarding Saunders was relevant to show the defendant's possession of and his intent to sell the narcotics, and that such evidence was more probative than prejudicial. On the basis of the evidence presented by the state, the jury reasonably could infer that the defendant associated with Saunders for the purpose of engaging in a drug transaction, which makes Angon's testimony relevant and probative to the state's case.

The defendant argues that such testimony was impermissible "guilt by association" evidence. It is well established that "guilt by association" evidence is insufficient to find a defendant guilty of a crime. *State* v. *Kelsey*, 160 Conn. 551, 554, 274 A.2d 151 (1970). We agree that such evidence has the potential to be prejudicial and stress that each case must turn on its own facts. Such evidence, however, is admissible if the state presents evidence of *other incriminating circumstances* that makes the evidence relevant and probative to the state's case. In the present case, the other incriminating evidence the state presented was the testimony of Lawrence that she saw the defendant engage in a drug transaction with an unknown individual in a black vehicle that Saunders was driving, and the videotape depicting the defendant leaving the gas station with Saunders after engaging in the drug transaction. See *State* v. *Ober*, 24 Conn. App. 347, 352, 588 A.2d 1080 (finding sufficient evidence of ownership of narcotics *in part* because defendant was seen conversing with *individual who was well known to police* and was in an area known for drug trafficking), cert. denied, 219 Conn. 909, 593 A.2d 134, 135, cert. denied, 502 U.S. 915, 112 S. Ct. 319, 116 L. Ed. 2d 260 (1991); see also *United States* v. *O'Connell*, 841 F.2d 1408, 1425 (8th Cir. 1988); *United States* v. *Raftery*, 563 F.2d 965, 966 (9th Cir. 1977). Thus, we conclude, given the circumstances in this case, that the evidence was properly admitted.

The judgment is affirmed.

In this opinion KELLER, J., concurred.

[1] Lawrence testified that the defendant was gone for approximately twenty to twenty-five minutes. A review of the videotape shows that the defendant left the gas station for approximately ten minutes.

[2] The court granted the defendant's motion to exclude any testimony describing the information in the tip. It noted, however, that the state was permitted to elicit testimony about any actions the police took on the basis of the information that they learned from the tip.

[3] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . possesses with the intent to sell or dispense . . . any narcotic substance . . . who is not, at the time of such action, a drug-dependent person, for a first offense shall be imprisoned not less than five years or more than twenty years . . . ."

[4] Lawrence was charged with conspiracy to possess narcotics. The charges against her were still pending when she testified.

[5] The state acknowledged during oral argument before this court that the print-out did not contain any inspection information.

[6] See *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[7] During closing arguments, defense counsel conceded that the substance found in the Jeep was heroin and that whoever had possession of the heroin

intended to sell it. He argued that the issue in the case was whether the defendant knew of and had possession of the narcotics.

[8] The defendant claims that the inspection information was improperly admitted into evidence, but does not contest the admission of the document itself, which showed the registration information, including that the Jeep was registered to a man named Victor A. Manana.

[9] We address only three acts of alleged impropriety in detail because we find the remainder to be without merit. First, the defendant claims that the prosecutor argued facts not in evidence on seven different occasions. Second, he claims that the prosecutor made a comment that impermissibly opined on Lawrence's credibility. Third, he claims that the prosecutor made a comment that impermissibly appealed to the emotions of the jury. After a review of the record, besides the three improprieties we discuss in detail, we conclude that the rest of the comments were not improper.

[10] The state is correct in that there is a direct conflict between Henriques' testimony and the defendant's testimony. Henriques testified that the defendant stated, "I was trying a thing and I g[ot] fucked.'' The defendant testified that he never told her this.

[11] The prosecutor did not specifically use the words "lied, "wrong,'' or "mistaken.'' Nevertheless, we find the comment improper because it still, in essence, required the jury to characterize testimony as wrong or mistaken when the testimony was capable of being reconciled.

[12] The only direct conflict cited by the state is the defendant's testimony that he was not nervous when the police pulled him over, which conflicts with Angon's testimony that the defendant was nervous. This conflict does not influence our conclusion.

[13] Defense counsel did contest Henriques' credibility during closing arguments when he argued about her motives to lie.

[14] The court stated that the jury "must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it.''