******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* CASEY SINCLAIR
## (SC 19932)

Palmer, McDonald, Robinson, D'Auria,
Mullins and Kahn, Js.*

*Syllabus*

Convicted, after a jury trial, of the crime of possession of narcotics with intent to sell by a person who is not drug-dependent, the defendant appealed to the Appellate Court, claiming that the admission of hearsay testimony used to establish that he was the de facto owner of a motor vehicle in which the narcotics were found violated his constitutional right to confront a witness against him and that certain improper statements by the prosecutor during closing argument violated his constitutional right to a fair trial. At the defendant's trial, a police officer, G, testified that he had conducted organized surveillance in a certain area of Waterbury on the basis of an anonymous tip that there would be drug activity there. G also testified that he had stopped a Jeep in which the defendant was a passenger and his girlfriend, L, was the driver, it having matched the description of the vehicle that had been provided in the tip. According to G, the defendant appeared unusually nervous as G approached the Jeep during the stop. A narcotics detection canine subsequently alerted to the presence of narcotics in the Jeep. L testified that, before the motor vehicle stop, the defendant had directed her to drive the Jeep that he had driven to her home in New York, where L lived, to a specific location in Waterbury, where he opened a hidden compartment in the Jeep and removed two white packages. He then walked to a black vehicle nearby, gave the packages to someone inside that vehicle, and started walking back to the Jeep with money in his hand. Before he got back to the Jeep, he noticed a police cruiser and threw the money into a nearby bush. The defendant then returned to the Jeep and directed L to drive to a nearby gas station with an attached convenience store, where he made a cell phone call, asking an individual to meet him so that he could retrieve the money. Surveillance video from the gas station was introduced at trial and showed the same black vehicle that L claimed had been involved in the drug transaction arriving at the gas station moments later, the defendant entering the back seat of that vehicle, and the vehicle driving away. The video also showed that the black vehicle returned to the gas station approximately ten minutes later and that the defendant then reentered the Jeep, which L then drove away. The video then showed the driver of the black vehicle exiting that vehicle and entering the convenience store. From that video, G identified the driver of the black vehicle as a known heroin dealer in Waterbury. G further testified that the Jeep was registered to an individual in Bronx, New York, and, over defense counsel's objection, testified that a New York vehicle inspection record indicated that the Jeep had been inspected at M Co., a business located in the Bronx adjacent to the defendant's business. G explained that certain of the inspection information had been relayed to him by an individual in the Waterbury Police Department, who had received that information from an employee with the New York State Police. The Appellate Court concluded that any violation of the defendant's constitutional rights with respect to the hearsay testimony regarding the inspection information for the Jeep was harmless beyond a reasonable doubt and that three acts of prosecutorial impropriety did not deprive the defendant of a fair trial. On the granting of certification, the defendant appealed to this court. *Held*:

1. This court concluded that the out-of-court statements to which G testified in support of the fact that the Jeep was inspected at M Co. were hearsay but were nontestimonial, the improper admission of that hearsay evidence therefore was not of constitutional magnitude, and the defendant did not meet his burden of proving that the evidentiary error was harmful:

   a. Although it was undisputed that the out-of-court statements were admitted for the truth of the matter asserted and, thus, constituted hearsay, and that there were no applicable hearsay exceptions, the

statements were not testimonial in nature, as the underlying vehicle inspection record was created solely for administrative or regulatory purposes rather than for the purpose of proving some fact at trial, and as the statements by the New York State Police and Waterbury Police Department employees connecting the inspection record to M Co. did not certify the inspection record's substance or effect because an objective declarant would not reasonably have believed that those statements would be used for the purpose of creating a record for use at a later criminal trial; accordingly, any error in the admission of the out-of-court statements was not of constitutional magnitude.

b. The defendant failed to prove that any evidentiary error in the admission of the out-of-court statements to which G testified was harmful, as the information conveyed through those statements was not of sufficient consequence, when viewed in the light of the state's relatively strong case against the defendant, so as to persuade this court that it had a significant effect on the jury's verdict; additional evidence, other than the defendant's presence in the Jeep, linked him to the crime of possession of narcotics with intent to sell, including L's testimony regarding the defendant's actions, which the jury could have found credible, the defendant's inconsistent trial testimony explaining his presence in Waterbury at the time of the drug transaction, the surveillance video, which appeared to contradict the defendant's testimony regarding his version of the events, and G's testimony that the individual who exited the black vehicle was a known heroin dealer in Waterbury, that the defendant appeared unusually nervous during the motor vehicle stop, that it was common for drug dealers to register vehicles that they use for the sale of drugs to another individual, as the defendant had done with the Jeep, and that most heroin sold in Waterbury has its source in the Bronx, where the defendant lived and owned a business.

2. The Appellate Court correctly concluded that, although three remarks by the prosecutor during closing argument were improper, they did not deprive the defendant of his due process right to a fair trial, there having been no reasonable likelihood that the jury would have returned a different verdict in the absence of those improprieties; the state's case was relatively strong, one of the prosecutor's improper remarks was invited by defense counsel's comments during closing argument and was an attempt to explain, in response to those comments, why L had difficulty with defense counsel's questions, the improprieties were not frequent or particularly severe, as the defendant's theory hinged on attacking the credibility of L, and none of the improper remarks significantly undercut that theory, defense counsel objected to only one of the improper remarks, and, although two of the improper remarks related to a critical issue in the case, the credibility of L versus the credibility of the defendant, the comments only indirectly bolstered L's credibility or undercut the defendant's credibility.

(*One justice concurring separately*)

Argued April 3, 2018—officially released July 9, 2019

*Procedural History*

Substitute information charging the defendant with the crime of possession of narcotics with intent to sell by a person who is not drug-dependent, brought to the Superior Court in the judicial district of Waterbury and tried to the jury before *Crawford, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Lavine* and *Keller, Js.*, with *Beach, J.*, concurring in part and dissenting in part, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*John L. Cordani, Jr.*, assigned counsel, with whom, on the brief, was *Damian K. Gunningsmith*, assigned counsel, for the appellant (defendant).

*Jennifer F. Miller*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attor-

ney, and *Don E. Therkildsen, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. Police officers discovered bricks of heroin and a large sum of cash in a vehicle registered to a third party in which the defendant, Casey Sinclair, was the passenger. Following a jury trial at which the driver of the vehicle testified against him, the defendant was convicted of one count of possession of narcotics with intent to sell by a person who is not drug-dependent in violation of General Statutes (Rev. to 2013) § 21a-278 (b). The Appellate Court thereafter rejected the defendant's claim that he was entitled to a new trial because (1) the admission of hearsay statements used to establish that he was the de facto owner of the vehicle—based on vehicle inspection records—violated his constitutional right to confront a witness against him, and (2) improper statements in the prosecutor's closing argument violated his constitutional right to a fair trial. *State* v. *Sinclair*, 173 Conn. App. 1, 7, 24, 162 A.3d 43 (2017). We granted the defendant's petition for certification to appeal to this court. We affirm the Appellate Court's judgment, albeit under different reasoning on the first issue. We conclude that admission of the hearsay statement was not an error of constitutional dimension and that the defendant did not meet his burden of proving that the evidentiary error was harmful.

I

At trial, the state proved its case against the defendant largely though the testimony of three witnesses: the defendant's girlfriend, Winsome Lawrence, who was the driver of the vehicle; Lawrence's cousin, Charmaine Henriques; and Sergeant Gary Angon of the Waterbury Police Department. In addition, the state introduced into evidence a surveillance video reflecting the defendant's conduct preceding his arrest.

Lawrence offered the following account of the events leading to that arrest. The defendant lives in the Bronx, New York, where he operates a used car business under the name of Sinclair Enterprise. On multiple occasions between October, 2012, and February, 2013, the defendant and Lawrence drove to Connecticut for various purposes. On each such occasion, the defendant drove a tan Jeep to Lawrence's house in Mount Vernon, New York, and then directed Lawrence to drive while the defendant sat in the passenger seat.[1]

On February 5, 2013, the defendant had Lawrence drive the Jeep to Waterbury, purportedly to go to a shopping mall. When they arrived in Waterbury, the defendant instructed Lawrence to exit the highway and eventually directed her to a side street, where he told her to stop the car. Shortly thereafter, when a black vehicle came toward the Jeep, the defendant directed Lawrence to sound the horn. The driver of the black vehicle made a U turn and parked a few cars ahead of the Jeep. To Lawrence's surprise, the defendant then

accessed a hidden compartment within the center console of the Jeep and removed two white packages of drugs. He took the packages to the black vehicle, gave them to someone inside, and walked back toward the Jeep with money in hand. Just then a marked police car slowly drove down the street toward the Jeep. When the defendant got into the Jeep, Lawrence saw that he no longer had the money in hand and asked him where it was. The defendant said that he had thrown it into a bush. He then directed Lawrence to drive to a nearby gas station.

After they arrived at the gas station, the defendant called someone on his cell phone and said, "Jay, come and pick me up, I'm going for the money, I'm going to pick up the money." The defendant then told Lawrence that he needed to get a bag, and he went into the gas station convenience store. After he returned to the Jeep, the same black vehicle involved in the earlier transaction pulled into the gas station. The defendant exited the Jeep and got into the black vehicle. The vehicle departed and then returned soon afterward. When the defendant returned to the Jeep, he had a black bag filled with money, which he placed in the Jeep's hidden compartment. He then directed Lawrence to drive to the mall in Waterbury.

Sergeant Angon offered the following account of the circumstances that followed. Waterbury police organized surveillance of the area near the Brass Mill Mall on the basis of an anonymous tip that the department received earlier in the day regarding drug activity that allegedly was going to occur that evening. At approximately 8 p.m., Angon saw a tan Jeep coming off the exit ramp of Interstate 84 near the mall, which fit the description of the vehicle that the department had been given. He and his partner conducted a motor vehicle stop. Upon approaching the Jeep, Angon observed that the defendant appeared unusually nervous. When Angon asked the defendant who owned the Jeep, the defendant replied that it was his "friend's."

A police detective from the department arrived with a narcotics detection canine and conducted a detection sweep of the Jeep. The dog alerted to the driver's side door and then to the center console. Angon and another officer then inspected the center console and discovered the hidden compartment beneath it. Therein they found a black bag containing $12,248 and ten bricks of what was later established to be heroin; each brick comprised of approximately 1000 prepackaged bags of heroin. The heroin had an estimated street value of between $45,000 and $60,000. The cash recovered from the compartment was consistent with the price of two bricks of heroin. The police officers placed the defendant and Lawrence under arrest.[2]

Henriques, Lawrence's cousin, testified that the defendant provided money to help pay Lawrence's bond

after the defendant and Lawrence were arrested. She further testified that when she met with the defendant to ask for his help, he told her that he "was trying a thing and [got] fucked."

In addition to this testimony, the jury viewed a surveillance video from the gas station for the period at issue. In the video, the defendant enters the convenience store and returns to the Jeep, carrying a beverage; no bag is in view. A black vehicle then arrives, and the defendant immediately gets into the rear right passenger seat of that vehicle. The vehicle leaves and then returns approximately ten minutes later. The defendant gets back into the Jeep, and the Jeep departs. The driver of the black vehicle exits that vehicle and enters the convenience store. Angon identified that person, Terence Saunders, as a heroin dealer in Waterbury. Angon also testified that most of the heroin sold in Waterbury comes from the Bronx.

In addition to this evidence regarding the incident in question, the state attempted to demonstrate that the defendant was the de facto owner of the Jeep. Angon testified that he had run a law enforcement query, which revealed that the Jeep was registered to a third party, Victor A. Manana, at an address in the Bronx.[3] Angon testified that, in his experience, drug dealers commonly register their vehicles in someone else's name and have someone else drive, so that if they come in contact with the police, they are not directly linked to the vehicle. Over the defendant's objections, Angon then was permitted to testify that the Jeep had been inspected at Manny's Auto. He testified that a Google search revealed an address for Manny's Auto and a photograph of that location, which showed Manny's Auto to be located adjacent to Sinclair Enterprise, the defendant's used car business. Angon explained that certain inspection information had been elicited by someone in his department from the New York State Police Department.

The defendant testified on his own behalf. According to the defendant, the tan Jeep belonged to Lawrence, and she was the "friend" to whom he was referring when responding to Angon's question of who owned the Jeep. He claimed that he had accompanied Lawrence to Connecticut on only one other occasion prior to this incident and was unaware that there were drugs in the Jeep. He admitted that he had asked Lawrence to stop at the gas station but claimed that it was for the purpose of meeting someone named Paul, who was interested in selling a vehicle to the defendant. According to the defendant, Paul was a passenger in the black vehicle that came to the gas station. The defendant joined Paul in the black vehicle, along with two individuals not known to the defendant, and drove to look at the vehicle Paul wished to sell. When they could not agree on a price, they returned to the gas station. Lawrence then drove the Jeep toward the mall.

The defendant's inculpation of Lawrence was lent marginal support by DNA testing performed by the state forensic laboratory on the packaging of the heroin and a strap used as a component of the hidden compartment in the Jeep. The defendant was excluded as a contributor to any of the DNA samples they were able to recover. Lawrence was excluded as a contributor to all but one sample, which had insufficient material to rule her out as a contributor.

The jury found the defendant guilty of the charge of possession of narcotics with intent to sell by a person who is not drug-dependent. The court subsequently sentenced him to an eight year term of imprisonment.

The defendant appealed from the trial court's judgment to the Appellate Court, claiming that (1) the admission of Angon's hearsay testimony concerning the Jeep's inspection site violated the defendant's rights under the confrontation clause of the sixth amendment to the United States constitution, and (2) numerous improprieties during the prosecutor's closing argument violated the defendant's due process right to a fair trial.[4] A divided Appellate Court affirmed the judgment of conviction. *State* v. *Sinclair*, supra, 173 Conn. App. 28. The majority held that, even if it were to assume that the admission of the inspection testimony was a confrontation clause violation, any such error would be harmless beyond a reasonable doubt. Id., 16. The majority further held that, although a few of the prosecutor's comments during closing argument were improper, those improprieties did not deprive the defendant of a fair trial. Id., 24. Judge Beach dissented in part, concluding that the admission of the inspection testimony was in fact a violation of the confrontation clause and that this error was not harmless beyond a reasonable doubt.[5] Id., 28–32.

This court granted the defendant's petition for certification to appeal, initially limited to the issues of whether the Appellate Court correctly concluded that any "presumed violation" of the defendant's confrontation clause rights was harmless beyond a reasonable doubt and that acts of prosecutorial impropriety did not deprive the defendant of a fair trial. *State* v. *Sinclair*, 326 Conn. 904, 163 A.3d 1205 (2017). In his brief to this court, the defendant addressed the threshold issue that the Appellate Court majority assumed but did not decide, asserting that the improperly admitted evidence amounted to constitutional, not merely evidentiary, error. In its responsive brief, the state asserted that this issue is outside the scope of the certified question and declined to address it. At oral argument, the state suggested that if we were to disagree with the Appellate Court's assessment of harm, that court could address the substantive issue on remand.

This court subsequently issued an order directing

the parties to file supplemental briefs addressing the following issues: (1) "Did the evidence establishing that the Jeep had been inspected at a repair shop located adjacent to the defendant's business constitute testimonial hearsay for purposes of *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)? See *United States* v. *Mendez*, 514 F.3d 1035, 1045 (10th Cir. 2008) (discussing public records under *Crawford*)." And (2) "[i]f not, can the defendant meet his burden of proving that admission of this evidence was harmful error?"

## II

We begin with the defendant's challenge to the admission of Angon's testimony regarding the Jeep's inspection. The defendant claims that this evidence constituted testimonial hearsay admitted in violation of his constitutional rights. The defendant further contends that the improper admission of this evidence was harmful, irrespective of whether it is reviewed under the standard of harm for constitutional error or evidentiary error. The state concedes that the inspection testimony was hearsay but contends that it is nontestimonial. The state further contends that its erroneous admission was not harmful, no matter what standard is applied.

Whether the admission of the contested testimony was constitutional error or merely evidentiary error will dictate which party bears the burden of proof as to harm and the extent of that burden. "[I]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt. . . . When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Osimanti*, 299 Conn. 1, 16, 6 A.3d 790 (2010).

On the basis of the record before this court, we are compelled to conclude that the statements regarding the inspection were nontestimonial. We further conclude that the improper admission of the hearsay evidence was not harmful.

## A

The following testimony regarding the Jeep was elicited from Angon on direct examination:

"[The Prosecutor]: And showing you what's been marked State's Exhibit 4—I'll show you on—up on the screen—let me just zoom in there for you. Could you tell the jury what you're seeing here?

"[Angon]: That is a printout from the law enforcement query of the vehicle registration number, New York F X L 3 7 5 4, which was the license plate on the Jeep Liberty. And it shows that it was registered to a Victor A. Manana, 1178 Washington Avenue, 5C, Bronx, New York.

* * *

"[The Prosecutor]: During your investigation, did you . . . determine if there were any inspections on that vehicle?

"[Angon]: Yes, there was a—for a vehicle to be registered in New York, New York state requires a vehicle inspection. I'm not sure exactly what the period between inspections is, but they have periodic inspections where they have to meet certain standards in order for the vehicle to be registered and remain registered in the state.

"[The Prosecutor]: And where was that done?

[Objections raised and overruled.]

"[The Prosecutor]: Where was the inspection done?

"[Angon]: The inspection was done at Manny Auto at 3 5 3 0—well, I'm not sure exact—I know it was a 3000 block of Webster Avenue in the Bronx, New York.

"[The Prosecutor]: And there's a—is there a business located adjacent to the Manny's Auto?

"[Angon]: Manny Auto is actually part of a fenced in lot that has one large business name over the front of it that I just got from a Google search of that address.[6]

"[The Prosecutor]: Do you know the name of that business?

[Objections raised and overruled.][7]

"[The Prosecutor]: What business is it next to?

"[Angon]: Sinclair Enterprise."

Angon's source for the inspection information became clearer when the following testimony was elicited on cross-examination:

"[Defense Counsel]: [B]y the way, the registration you can get that information from the police department, correct, from—

"[Angon]: From—

"[Defense Counsel]: your police computers.

"[Angon]: Yes, I can run a—the law enforcement query of a license plate. So I can punch the numbers in on a computer terminal, and they'll give me the registration.

"[Defense Counsel]: Okay. And you can get an official documentation as to registration, things like that?

"[Angon]: Yes.

"[Defense Counsel]: Okay. And you've also now indicated on direct examination that you ran the—some sort of inspection record of the vehicle also.

"[Angon]: *My office contacted [the] New York State Police to see if they could translate, for lack of a better*

*word, a lot of the information that's on the printout, because different states have different ways of recording things. One of the numbers on the New York query is an inspection number that gets issued because that's part of them getting registrations for the car. And then whoever issues that inspection number has a number.*[8]

"[Defense Counsel]: And then when was that inquiry made?

"[Angon]: Sometime in the last two days." (Emphasis added; footnotes added.)

Defense counsel later moved to have Angon's testimony relating to the inspection stricken from the record. He argued that cross-examination had revealed that Angon did not obtain the information firsthand but, rather, secondhand from an unidentified person. As such, he submitted that this testimony was double hearsay "at best" and that its admission violated the defendant's rights under *Crawford* to confront witnesses against him. The trial court denied the motion, stating that the jury could determine what weight to give the testimony.

We begin our analysis of the importance of Angon's testimony with the observation that there are three layers of potential hearsay imbedded in it: (1) the New York inspection record itself; (2) the statement by a New York State Police employee relaying information in that record to a Waterbury Police Department employee; and (3) the statement by the Waterbury police employee relaying this information to Angon. There is no dispute that these out-of-court statements were admitted for the truth of the matter asserted and therefore constitute hearsay.[9] See Conn. Code Evid. § 8-1 (3); see also *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 390, 119 A.3d 462 (2015) ("[s]uch statements generally are inadmissible unless they fall within an exception to the hearsay rule"). Each layer of hearsay would have to independently satisfy an exception to the hearsay rule in order to be admissible. See Conn. Code Evid. § 8-7.

Our concern in the present case is not, however, whether there are applicable hearsay exceptions to avoid evidentiary error; the state concedes there are not. Rather, our concern is that, "[i]n the context of a criminal trial . . . the admission of a hearsay statement against a defendant is further limited by the confrontation clause of the sixth amendment." *State* v. *Smith*, 289 Conn. 598, 618, 960 A.2d 993 (2008). The confrontation clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const., amend. VI.[10]

"Under *Crawford* v. *Washington*, supra, 541 U.S. 59, hearsay statements of an unavailable witness that are

testimonial in nature may be admitted in accordance with the confrontation clause only if the defendant previously has had the opportunity to cross-examine the unavailable witness. Nontestimonial statements, however, are not subject to the confrontation clause and may be admitted under state rules of evidence. *Davis* v. *Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Thus, the threshold inquiries that determine the nature of the claim are whether the statement was hearsay, and if so, whether the statement was testimonial in nature, questions of law over which our review is plenary." *State* v. *Smith*, supra, 289 Conn. 618–19.

"[A] testimonial statement is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . *Crawford* v. *Washington*, supra, 541 U.S. 51. Although the United States Supreme Court did not provide a comprehensive definition of what constitutes a testimonial statement in *Crawford*, the court did describe three core classes of testimonial statements: [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions [and] . . . [3] *statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial* . . . . Id., 51–52." (Emphasis added; internal quotation marks omitted.) *State* v. *Smith*, supra, 289 Conn. 622–23. It is this third category into which the defendant contends that Angon's testimony falls.

In *Davis* v. *Washington*, supra, 547 U.S. 822, the United States Supreme Court elaborated on the third category, applying a "primary purpose" test to distinguish between testimonial and nontestimonial statements made to police officials. In the context of considering hearsay statements made to a 911 operator, the court in *Davis* held: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. *They are testimonial when the circumstances objectively indicate* that there is no such ongoing emergency, and *that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.*"[11] (Emphasis added.) Id.

"In *State* v. *Slater*, [285 Conn. 162, 172 n.8, 939 A.2d 1105 (2008), this court] reconciled *Crawford* and *Davis*, noting: 'We view the primary purpose gloss articulated

in *Davis* as entirely consistent with *Crawford*'s focus on the reasonable expectation of the declarant. . . . [I]n focusing on the primary purpose of the communication, *Davis* provides a practical way to resolve what *Crawford* had identified as the crucial issue in determining whether out-of-court statements are testimonial, namely, whether the circumstances would lead an objective witness reasonably to believe that the statements would later be used in a prosecution.' " *State* v. *Smith*, supra, 289 Conn. 623–24.

*Crawford*'s progeny indicates that a significant factor in ascertaining whether the primary purpose of the communication is testimonial, i.e., whether the declarant reasonably would believe that the statement would be used in a subsequent prosecution, is the relative formality or informality of the manner in which the statement was given or elicited. See, e.g., *Bullcoming* v. *New Mexico*, 564 U.S. 647, 665, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (concluding that "the formalities attending the 'report of blood alcohol analysis' are more than adequate to qualify [the declarant's] assertions as testimonial" because declarant's certificate was " 'formalized' in a signed document," was "headed a 'report,' " and report form refers to courts' rules that provide for admission of this type of report); id., 671 (Sotomayor, J., concurring in part) ("The formality inherent in the certification further suggests its evidentiary purpose. Although [f]ormality is not the sole touchstone of our primary purpose inquiry, a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial." [Internal quotation marks omitted.]); *Michigan* v. *Bryant*, 562 U.S. 344, 366, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (concluding that Michigan Supreme Court did not sufficiently account for importance of informality in encounter between victim and police in assessing whether statement was testimonial but acknowledging that "informality does not necessarily indicate . . . the lack of testimonial intent"); *Melendez–Diaz* v. *Massachusetts*, 557 U.S. 305, 308, 310, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009) ("certificates of analysis" completed by employees of State Laboratory Institute of the Massachusetts Department of Public Health were testimonial because they were "incontrovertibly . . . solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact" [internal quotation marks omitted]); *Melendez–Diaz* v. *Massachusetts*, supra, 310–11 (" 'certificates' are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination' "); *Davis* v. *Washington*, supra, 547 U.S. 827 (emphasizing difference in level of formality between interviews in case before it and in *Crawford*); *Davis* v. *Washington*, supra, 830 (determining that act of separating declarant from defendant in order to conduct investigation was "formal enough" under circumstances to render statement testimonial);

*United States* v. *Smalls*, 605 F.3d 765, 778 (10th Cir. 2010) ("[s]ynthesizing *Crawford* and *Davis*, we might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution").

The United States Supreme Court's most recent foray into confrontation clause jurisprudence, however, calls into question the continuing vitality of the primary purpose test, at least as articulated in *Davis*. In *Williams* v. *Illinois*, 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012), an expert had testified that a DNA profile produced by an outside laboratory matched a profile produced by the state police laboratory using a sample of the petitioner's blood. Id., 56 (plurality opinion). Five justices agreed that the profile relied on by the expert was nontestimonial, but the fifth justice rejected the plurality's "flawed analysis"; id., 104 (Thomas, J., concurring in the judgment); as did the four dissenting justices.[12] Id., 135–38 (Kagan, J., dissenting). Justice Alito, writing for the plurality, reasoned that "[t]he abuses that the court has identified as prompting the adoption of the [c]onfrontation [c]lause shared the following two characteristics: (1) [t]hey involved out-of-court statements having the primary purpose of accusing *a targeted individual* of engaging in criminal conduct and (2) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." (Emphasis added.) Id., 82. The plurality noted that all but one of the court's cases involving testimonial hearsay post-*Crawford* had both characteristics, the one exception having only the second characteristic. Id., 82–83. The plurality reasoned that the DNA profile at issue lacked the first characteristic because no one at the laboratory producing it could know that it would inculpate the petitioner, let alone any other person who might currently be in a law enforcement database. Id., 84–85. "Under these circumstances, there was no prospect of fabrication and no incentive to produce anything other than a scientifically sound and reliable profile." (Internal quotation marks omitted.) Id., 85 (plurality opinion); see also id., 86–87, 89 (Breyer, J., concurring) (agreeing with plurality's reasoning but emphasizing administrative burden of requiring every person working on reports to testify).

In his concurrence, Justice Thomas reiterated his previously expressed view that the confrontation clause only "reaches formalized testimonial materials, such as depositions, affidavits, and prior testimony, or statements resulting from formalized dialogue, such as custodial interrogation." (Internal quotation marks omitted.) Id., 111. He reasoned that the primary purpose test, as originally articulated in *Davis*, was a necessary, but not sufficient, criterion to render a statement testi-

monial because a statement may serve more than one purpose. See id., 114 (Thomas, J., concurring in the judgment) ("Statements to police are often made both to resolve an ongoing emergency and to establish facts about a crime for potential prosecution. The primary purpose test gives courts no principled way to assign primacy to one of those purposes." [Emphasis omitted.]). He noted that "[t]he shortcomings of the original primary purpose test pale in comparison, however, to those plaguing the reformulated version that the plurality suggests today." Id. (Thomas, J., concurring in the judgment). Both he and the four dissenting justices agreed that a requirement that the statement must have the primary purpose of accusing a targeted individual did not derive from either the text or the history of the confrontation clause. Id. (Thomas, J., concurring in the judgment); id., 135 (Kagan, J., dissenting).

Justice Kagan, writing for the four dissenting justices, argued that application of the court's precedent compelled the conclusion that the DNA profile in the laboratory report was testimonial hearsay, because it was "a statement [that] was made for the primary purpose of establishing 'past events potentially relevant to later criminal prosecution'—in other words, for the purpose of providing evidence." Id., 135. With regard to Justice Thomas' view that the laboratory report did not qualify as testimonial because it was neither a sworn nor certified declaration of fact, Justice Kagan observed that there was no material difference between the degree of formality in the reports at issue and those in its prior cases deemed testimonial: "Each report is an official and signed record of laboratory test results, meant to establish a certain set of facts in legal proceedings." Id., 139. Justice Kagan noted that, in those prior cases, "a law enforcement officer provided evidence to a state laboratory assisting in police investigations," "the analyst tested the evidence and prepared a certificate concerning the result[s]," and "the certificate was formalized in a signed document . . . headed a report. . . . That was enough." (Citation omitted; internal quotation marks omitted.) Id.

In considering what to make of *Williams*, we are mindful of the Supreme Court's direction that, "[w]hen a fragmented [c]ourt decides a case and no single rationale explaining the result enjoys the assent of five [j]ustices, the holding of the [c]ourt may be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds . . . ." (Internal quotation marks omitted.) *Marks* v. *United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977). But see *Grutter* v. *Bollinger*, 539 U.S. 306, 325, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003) (acknowledging that there are cases in which *Marks* test "is more easily stated than applied to the various opinions supporting the result" [internal quotation marks omitted]). The problem with *Williams*, as the Second Circuit Court of

Appeals has aptly observed, is that the court made it impossible to identify the narrowest ground because the analyses of the various opinions are irreconcilable. See *United States* v. *James*, 712 F.3d 79, 95 (2d Cir. 2013), cert. denied, 572 U.S. 1134, 134 S. Ct. 2660, 189 L. Ed. 2d 208 (2014); see also *Williams* v. *Illinois*, supra, 567 U.S. 141 (Kagan, J., dissenting) ("[t]he five [j]ustices who control the outcome of today's case agree on very little" and "have left significant confusion in their wake"). Like the Second Circuit, we "think it sufficient to conclude that we must rely on Supreme Court precedent before *Williams* to the effect that a statement triggers the protections of the [c]onfrontation [c]lause when it is made with the primary purpose of creating a record for use at a later criminal trial." *United States* v. *James*, supra, 712 F.3d 95–96; see also *State* v. *Lebrick*, 179 Conn. App. 221, 244, 178 A.3d 1064 ("[g]iven that no readily applicable rationale for the court's holding in *Williams* obtained the approval of a majority of the justices, its precedential value seems, at best, to be confined to the distinct factual scenario at issue in that case"), cert. granted, 328 Conn. 912, 179 A.3d 218 (2018). The one thread of *Williams* that is consistent with the court's earlier precedent is that there is agreement among all of the justices that the formality attendant to the making of the statement must be considered.

With this framework in mind, we turn to Angon's hearsay testimony in the present case. We begin with the New York vehicle inspection record, which purportedly indicated that Manny's Auto had been assigned the inspection number revealed by Angon's law enforcement query. Public records, such as the inspection records at issue, also are governed by the primary purpose test. The United States Supreme Court has explained that "[b]usiness and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez–Diaz* v. *Massachusetts*, supra, 557 U.S. 324; see also *United States* v. *Mendez*, 514 F.3d 1035, 1044–1045 (10th Cir.) ("As a public record, the [Immigration and Customs Enforcement] Central Index System is not testimonial. . . . Where records are not prepared for litigation or criminal prosecution, but rather administrative and regulatory purposes, the 'principal evil at which the [c]onfrontation [c]lause was directed' is not implicated." [Citations omitted.]), cert. denied, 553 U.S. 1044, 128 S. Ct. 2455, 171 L. Ed. 2d 250 (2008); *United States* v. *Vidrio-Osuna*, 198 Fed. Appx. 582, 584 (9th Cir. 2006) (admission of record that is " 'routine, objective, cataloging of an unambiguous factual matter,' " such as birth certificate, is not testimonial). Nonetheless, such records will be deemed testimonial if they were created for the purpose of

establishing or proving some fact at trial. See, e.g., *Melendez–Diaz* v. *Massachusetts*, supra, 324. Compare *United States* v. *Feliz*, 467 F.3d 227, 236–37 (2d Cir. 2006) (concluding that autopsy report is public record and is not testimonial even though medical examiner may understand that report may be available for use at trial), cert. denied sub nom. *Erbo* v. *United States*, 549 U.S. 1238, 127 S. Ct. 1323, 167 L. Ed. 2d 132 (2007), with *United States* v. *James*, supra, 712 F.3d 99, 101–102 (concluding that court must consider circumstances of death to determine whether primary purpose of autopsy was for use in criminal prosecution).

State vehicle inspection records are created solely for administrative or regulatory purposes. Therefore, the information in the New York inspection record was not testimonial hearsay. See footnote 9 of this opinion (acknowledging possibility that inspection record was not hearsay).

The fact that the underlying record is nontestimonial does not, however, end our inquiry. Just as every layer of hearsay must independently satisfy a hearsay exception to be admissible, a subsequent recitation of a nontestimonial statement may itself be testimonial. See, e.g., *United States* v. *Brooks*, 772 F.3d 1161, 1167–68 (9th Cir. 2014) (court determined that there was *Crawford* violation when postal inspector testified that postal supervisor provided inspector with tracking number and mailing information on package, which was used to prove that it was same package that defendant had mailed earlier that day, when supervisor would have understood that purpose of inquiry was investigative and supervisor's statement reported past event); *United States* v. *Bustamante*, 687 F.3d 1190, 1194 (9th Cir. 2012) (court determined that there was *Crawford* violation when affidavit of official from Philippines' Office of Civil Registrar General was admitted, which attested that defendant's birth record indicated that he was born in Philippines, to prove that defendant was not United States citizen for purposes of various criminal charges); *United States* v. *Weiland*, 420 F.3d 1062, 1076–1077 (9th Cir. 2005) (court considered whether *Crawford* was violated by admission of documents in " 'penitentiary packet,' " which "incorporate two layers of hearsay, and, correspondingly, two potential [c]onfrontation [c]lause problems: [1] the records themselves, and [2] the statements of [the Oklahoma records custodian] and the Secretary of State . . . providing the foundation to establish their authenticity," and then considered whether second layer was testimonial after concluding that first layer was public record and nontestimonial), cert. denied, 547 U.S. 1114, 126 S. Ct. 1911, 164 L. Ed. 2d 667 (2006); see also *Tapke* v. *Brunsman*, 565 Fed. Appx. 430, 435, 436 (6th Cir.) (court considered whether *Crawford* was violated by admission of social worker's report regarding child sexual abuse, which contained double hearsay, and determined that first level of hear-

say, child's statement, was nontestimonial because primary purpose of interview was to assist physicians in conducting medical examination, and then examined second level of hearsay, social worker's report recounting child's statement, to determine whether it was testimonial), cert. denied sub nom. *Tapke* v. *Moore*, U.S. , 135 S. Ct. 486, 190 L. Ed. 2d 367 (2014); *Jones* v. *Basinger*, 635 F.3d 1030, 1040–1043 (7th Cir. 2011) (concluding that confrontation clause was violated by admission of police officer's testimony because second layer of hearsay was testimonial, when officer testified that informant stated that his brother had confessed to him that he, along with defendant and others, had committed murder and that defendant's need for money was motive).

The United States Supreme Court has distinguished between a statement by a custodian "certify[ing] to the correctness of a copy of a record kept in his office," which historically has been admissible and thus deemed nontestimonial, and a declarant's statement "furnish-[ing], as evidence for the trial of a lawsuit, his interpretation of what the record contains or shows, or to certify to its substance or effect," which is testimonial. (Internal quotation marks omitted.) *Melendez–Diaz* v. *Massachusetts*, supra, 557 U.S. 322. If a nontestimonial record is used to create a new record for the purpose of providing evidence for a criminal prosecution, that new record is testimonial. See id., 322–23 ("[a] clerk could by affidavit authenticate or provide a copy of an otherwise admissible record, but could not do what the analysts did here: create a record for the sole purpose of providing evidence against a defendant" [emphasis omitted]); see also *United States* v. *Bustamante*, supra, 687 F.3d 1194 (The court explained why an affidavit from an official attesting that the defendant's birth record indicated that he was born in the Philippines, offered to prove that the defendant was not a United States citizen for purposes of various criminal charges, was testimonial: The affidavit was created for the purpose of an investigation into the defendant's citizenship and was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. . . . Rather than simply authenticating an existing [nontestimonial] record, [the official] created a new record for the purpose of providing evidence against [the defendant]." [Citations omitted.]).

The statements in the present case by the New York State Police and Waterbury Police Department employees plainly do not certify to the correctness of the New York inspection record (or a copy thereof). Nor do they *interpret* what the record contains or shows. The question is whether the statements *certify* the record's substance or effect.

We observe that the informal manner in which the

information was elicited and communicated bears no indicia of a " 'solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Crawford* v. *Washington*, supra, 541 U.S. 51. In other words, the declarant did not take the information in the public record and create a new record for use at trial. The information was obtained through a telephone call. There is no indication that the call was recorded (e.g., a 911 call) or that the information was memorialized *in any manner*. There is nothing in the record to indicate whether the identity (name and position) of the declarant was elicited or offered. Nor does the record indicate how the information was in turn conveyed by the Waterbury Police Department employee to Angon.[13]

Although the pre-*Williams* case law indicates that a lack of formality will not necessarily deprive a statement of its testimonial character, *Williams* suggests that this fact would be dispositive. Even if we were permitted to look beyond the casual manner in which these statements were elicited and conveyed, *Crawford*'s first principles require proof that an objective declarant reasonably would believe that his or her statement would be used for prosecutorial purposes. Such proof is not evident in the present record. Neither the substance nor the form of the statements at issue objectively demonstrates that they were made with the primary purpose of creating a record for use at a later criminal trial. The inspection information conveyed (i.e., inspection number X is assigned to Manny's Auto) is neutral. It bears no overt relevance to any criminal activity or even any individual. There is no basis in the record to infer that the New York State Police employee was informed about the potential relevance of this information to a criminal prosecution. See *Gregor* v. *Franklin*, 466 Fed. Appx. 709, 711 (10th Cir. 2012) (The court, in determining that it was reasonable to conclude that, because the declarant's statement to the officer did not inculpate the defendant in criminal activity, its introduction did not amount to a *Crawford* violation, noted that "not every statement made in response to an interrogation is testimonial for purposes of confrontation clause analysis . . . . Rather, the emphasis must be on the responses generated. . . . *Crawford* itself deals with witnesses against the accused bearing inculpatory testimonial statements. [Citations omitted; internal quotation marks omitted.]). In fact, the information was not even necessarily relevant to the defendant's case. It became relevant only because the name associated with the number subsequently was linked by Angon to an address that happened to be in close proximity to the defendant's business. Our review of *Crawford* cases reveals no instance in which such neutral information was deemed testimonial.

The cases on which the defendant relies, as well as others revealed by our independent research, are consistent with our conclusion in the present case that

the statements relaying the information in the inspection record are nontestimonial hearsay. By contrast, in each such case, the manner in which the information was conveyed or elicited provided an objective indication that the declarant would have believed that his or her statement could be used in a criminal prosecution. See *United States* v. *London*, 746 Fed. Appx. 317, 319–20 (5th Cir. 2018) (notarized documents containing statements from Assistant Executive Secretary at Federal Deposit Insurance Corporation [FDIC] regarding bank's FDIC status in relation to query indicating that such status was relevant to robbery charge); *United States* v. *Brooks*, supra, 772 F.3d 1167–68 (postal supervisor provided information in response to investigation directed at individual); *United States* v. *Bustamante*, supra, 687 F.3d 1194 (affidavit attesting to entry in defendant's birth record); *United States* v. *Smith*, 640 F.3d 358, 362–63 (D.C. Cir. 2011) (letters from court clerk, containing seal and clerk's signature, stating that "it appears from an examination of the records on file in this office" that defendant had been convicted of felony); *Cascen* v. *Virgin Islands*, 60 V.I. 392, 399, 411 (2014) (forms generated by firearms supervisor for Virgin Islands Police Department indicating that her search of firearm registry revealed that defendant did not have license to possess firearm in Virgin Islands).

The record before us does not establish that any declarant objectively would have believed that his or her statement relaying that the inspection number revealed by Angon's query corresponded to Manny's Auto would be used as evidence in a prosecution. Most of the concerns articulated with respect to the statement by the New York State Police employee apply equally to the relaying of that statement to Angon by the Waterbury Police Department employee. See footnote 13 of this opinion. Therefore, neither of those statements was testimonial, and the admission of the hearsay was not an error of constitutional magnitude.

B

Our conclusion in the preceding section requires us to consider whether the defendant has established that the evidentiary error in admitting Angon's hearsay statement regarding the Jeep's inspection site was harmful error. We conclude that he has not.

The law governing harmless error for nonconstitutional evidentiary claims is well settled. "[W]hether [an improper ruling] is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of

the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Favoccia*, 306 Conn. 770, 808–809, 51 A.3d 1002 (2012).

In order for the jury to have found the defendant guilty in the present case, the state had to prove that the defendant knowingly possessed and intended to sell the narcotics found in the Jeep. See General Statutes (Rev. to 2013) § 21a-278 (b). Because both the defendant and Lawrence were in the vehicle at the time of the police stop and the drugs were in a hidden compartment, the state had to prove the defendant's constructive possession of the narcotics at trial. "Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . [Although] mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Bruno*, 293 Conn. 127, 136–37, 975 A.2d 1253 (2009).

There were plenty of circumstances other than the defendant's presence in the Jeep linking him to the crime of possession with intent to sell. Although Lawrence and the defendant pointed the finger at the other at trial, the jury reasonably could have found Lawrence credible as to the defendant's actions, even if it did not credit her testimony that she had no knowledge that the drugs were in the Jeep. See, e.g., *State* v. *Brown*, 299 Conn. 640, 648, 11 A.3d 663 (2011) ("[t]he trier of fact may credit part of a witness' testimony and reject other parts" [internal quotation marks omitted]). Her testimony was corroborated by many facts independent of the inspection information.

The defendant admitted to Henriques, in so many words, that he was the one who was selling the narcotics. He provided $4000 to help Lawrence make bail. The defendant was in the company of a known Waterbury heroin dealer just before a large quantity of heroin, packaged for sale, was discovered in the car in which he was a passenger. As we explain later, it was clear that the defendant was well acquainted with this person.

During the motor vehicle stop, the defendant appeared more nervous than the average person who is subject to such a stop.

The defendant's own account of the events on the night in question was manifestly not credible. He initially testified on direct examination that the purpose of the February 5, 2013 trip was to go to "the casino" with Lawrence, a trip that he claimed they had made before. The defendant later admitted that he had never been to a casino in Connecticut and did not know how to get there from Waterbury. Thereafter, the defendant offered a different explanation for the February 5 trip. He testified that he and Lawrence had driven to Connecticut that night to look at a used car owned by a man named Paul. The defendant testified that he had never previously spoken to Paul and only learned about him through Lawrence, who had informed the defendant that Paul wanted to sell him a used car. The defendant also claimed not to know any of the other occupants of the black vehicle.

The surveillance video tells a different story. It shows a black vehicle arriving at the gas station approximately three minutes after the defendant is seen on his cell phone. The vehicle is being driven by a Waterbury heroin dealer. The defendant walks up to the vehicle as it is pulling into the gas station and, without hesitation, enters the rear passenger seat the moment it stops. The vehicle immediately departs. It strains credulity to believe that neither the defendant nor three purported strangers would take a moment to confirm the identity of the other or to introduce themselves.[14] The video also reflects that the black vehicle returned to the gas station approximately eleven minutes after it left with the defendant. That brief period of time would be consistent with the time it would take to retrieve something from a known location nearby (the cash in the bush). That period does not seem consistent with the time that it would take to drive the "mile and a-half [or] two miles down the road" where the defendant claimed Paul's vehicle was located, to conduct a sufficiently thorough inspection of the vehicle to decide to make an offer, to engage in a failed negotiation on price, and then to return to the gas station.

Finally, we observe that evidence independent of the inspection testimony pointed to the defendant as the person having control over the Jeep. The defendant mentioned an unnamed "friend" as the Jeep's owner when Angon inquired during the vehicle stop. His post facto claim that the friend to whom he was referring was Lawrence was manifestly not credible given that she was present when he identified the purported owner. Angon testified that it was common for drug dealers to register a vehicle they use for the sale of drugs to another person. The defendant had a used car business, which would provide ready access to vehicles,

including those registered to third parties. The Jeep was registered in the name of a person who purportedly lives in the Bronx. The defendant's business is in the Bronx. Angon testified that most heroin sold in Waterbury comes from the Bronx.

We conclude that the inspection testimony, while not unimportant, was not of sufficient consequence when viewed in light of the state's relatively strong case against the defendant to persuade us that the improper admission of this evidence had a significant effect on the verdict. Therefore, the defendant has not proved harmful error.

### III

Finally, we turn to the defendant's claim that the Appellate Court incorrectly concluded that, although the prosecutor made certain improper statements during closing argument, those improprieties did not deprive the defendant of his due process right to a fair trial. We disagree.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 552, 78 A.3d 828 (2013). "[T]he defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense." *State* v. *A. M.*, 324 Conn. 190, 199, 152 A.3d 49 (2016).

In determining whether the defendant was deprived of his due process right to a fair trial, "we are guided by the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case. . . . [A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Martinez*, 319 Conn. 712, 736, 127 A.3d 164 (2015); see also *State* v. *Gould*, 290 Conn. 70, 77, 961 A.2d 975 (2009) (court looks to cumulative effect of all improprieties).

In the present case, the Appellate Court identified three improprieties that occurred during closing argument.[15] In the first instance, the prosecutor argued to the jury that, to find the defendant not guilty, the jury had to disbelieve the testimony of Angon, Henriques, and another state witness (*Singh* violation). See *State v. Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002) ("[A] witness may not be asked to characterize another witness' testimony as a lie, mistaken or wrong. Moreover, closing arguments providing, in essence, that in order to find the defendant not guilty, the jury must find that witnesses had lied, are similarly improper." [Footnote omitted.]).

In the second and third instances, the prosecutor improperly disparaged the integrity and role of defense counsel. See *State* v. *Outing*, 298 Conn. 34, 82–83, 3 A.3d 1 (2010) ("[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . [I]t is improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." [Citation omitted; internal quotation marks omitted.]), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Specifically, during his rebuttal argument, in response to defense counsel's assertion that the lack of DNA evidence linking the defendant to the drugs was significant, the prosecutor first stated, "[s]o here's the state's Hobson's choice, our conundrum, if we don't put the evidence up to the lab, defense can argue, oh my God, they didn't test anything. Oh, my God, what are they doing? Just like he did with the black bag, right, and then we do send the stuff up there, we know we're not gonna get stuff, *usually they use that against us*, right, it's a Hobson's choice." (Emphasis added.) Then, in response to defense counsel's argument that Lawrence had no difficulty understanding the prosecutor's questions but intentionally failed to understand defense counsel's questions, the prosecutor stated, "[w]hen you think about [Lawrence's] testimony, think about the manner in which I ask questions, even consider how I was talking. And think about the rocket fire questions from defense counsel. *Was he trying to trip her up? Was he trying to put words in her mouth?*" (Emphasis added.)

Applying the *Williams* factors to the present case, we agree with the Appellate Court that they do not collectively weigh in favor of the defendant. First, defense counsel invited one of the three prosecutorial improprieties regarding his cross-examination of Lawrence. Specifically, defense counsel stated in his closing argument that Lawrence deployed a strategy of claiming she did not understand defense counsel's questions or

could not recall the answers, even though she had no difficulty understanding the prosecutor or recalling information necessary to answer his questions. The prosecutor's comment regarding defense counsel's cross-examination technique was an attempt to explain why Lawrence had difficulty with defense counsel's questions.

Second, the improprieties were not particularly severe. The defendant's theory hinged on attacking the credibility of Lawrence, not of the police. None of the improper comments significantly undercuts that theory. Although one of the problems arising from a *Singh* violation is that it risks distorting the state's burden of proof; see *State* v. *Singh*, supra, 259 Conn. 709–10 ("such comments excluded possibility that jury could have concluded only that witnesses were probably truthful and defendant was probably lying, thereby preventing jury from 'return[ing] a verdict of not guilty because the evidence might not be sufficient to convict the defendant beyond a reasonable doubt' " [emphasis omitted]), the fact that it was not directed at the state's key witness and had no impact on the critical video evidence renders it less serious. Defense counsel objected to only one of the comments—the prosecutor's comment concerning defense counsel's cross-examination of Lawrence—which suggests that the other comments were not viewed as particularly serious. See, e.g., *State* v. *Medrano*, 308 Conn. 604, 620–21, 65 A.3d 503 (2013) ("[w]hen defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial" [internal quotation marks omitted]). The court sustained that objection, although it declined a subsequent request for a curative instruction.

Third, there were only three brief improper comments, all during rebuttal argument. Cf. *State* v. *Singh*, supra, 259 Conn. 724 (finding it noteworthy that improper comments occurred in both cross-examination and closing arguments). Those comments can hardly be properly characterized as frequent in the totality of the closing argument.

Fourth, although two of the comments related to a critical issue in the case, namely, the credibility of Lawrence and the defendant, the comments only indirectly bolstered Lawrence's credibility or undercut the defendant's credibility. Defense counsel had been able to strongly argue to the jury that Lawrence's testimony was not credible in light of certain impeachment evidence. Although the defendant did rely on the lack of DNA evidence tying him to the narcotics, DNA was not critical to the case, and the comment regarding typical defense strategies regarding such evidence did not place such argument in doubt.

Fifth, the strength of any curative measures does not weigh in favor of either party. The trial court sustained defense counsel's only objection in the presence of the jury but denied his request for a curative instruction. The court properly instructed the jury that nothing the attorneys said was evidence. Further, the court properly instructed the jury that it was free to credit all, some, or none of each witness' testimony.

Finally, the state's case was relatively strong. Despite inconsistencies in Lawrence's testimony, which undoubtedly was critical to the case, the video provided neutral evidence that sufficiently corroborated her account of the defendant's conduct. Moreover, the defendant's own testimony, which was internally inconsistent and objectively inconsistent with the video, was strong evidence of his guilt.

We conclude that there was no reasonable likelihood that the jury would have returned a different verdict in the absence of the three relatively inconsequential improprieties. Therefore, the defendant has not met his burden of establishing that he was deprived of his due process right to a fair trial.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, ROBINSON, MULLINS and KAHN, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] On one occasion, the defendant brought a different color Jeep, but the driving arrangement was the same.

[2] Lawrence admitted that, in exchange for her testimony against the defendant, she hoped to have the state dismiss the charge (unidentified) filed against her. Lawrence is a citizen of Jamaica and had a green card permitting her to be in the United States. She disclaimed any knowledge that a conviction could result in her deportation.

[3] Manana was not called as a witness, and no further evidence was adduced as to his identity or connection to the defendant.

[4] The defendant raised an additional evidentiary claim, which the Appellate Court rejected; *State* v. *Sinclair*, supra, 173 Conn. App. 24–28; that is not at issue in this certified appeal.

[5] In light of this conclusion, Judge Beach declined to reach the issue of whether the conviction should have been reversed due to the prosecutorial improprieties. *State* v. *Sinclair*, supra, 173 Conn. App. 32 n.2 (*Beach, J.*, concurring in part and dissenting in part).

[6] The defendant does not challenge the admission of the information yielded from Angon's Google search, only the statements that led to that search.

[7] In response to a hearsay objection, the state initially argued that the inspection information was admissible as a business record and then later argued that Angon could testify as to his personal knowledge of the record. The court initially overruled defense counsel's objection and told Angon: "You can testify as to what you know and indicate how you know it."

[8] A printout of the Jeep's registration record was admitted into evidence without objection. That printout does not contain any inspection information. No other printout relating to the Jeep was admitted into evidence. We assume that Angon's reference to inspection numbers on a printout, which needed translation, refers to information obtained in a different computer query.

[9] Although the state concedes that Angon's inspection testimony contains hearsay, we note the possibility that the inspection record itself may not be hearsay. We cannot ascertain from the record whether the inspection numbers are assigned to inspection sites by computer or whether there is some aspect of human input involved. "Generally, mechanically generated

records don't qualify as 'statements' for hearsay purposes, but when those records are developed with human input, they can become hearsay statements." *United States* v. *Bates*, 665 Fed. Appx. 810, 814 (11th Cir. 2016); see *State* v. *Buckland*, 313 Conn. 205, 221, 96 A.3d 1163 (2014) (machine generated data is not subject to restrictions imposed by *Crawford* and its progeny), cert. denied,      U.S.      , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015); see also *Bullcoming* v. *New Mexico*, 564 U.S. 647, 660, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) (contrasting "raw, machine-produced data" or "a machine-generated number" with certifications relating to past events and human actions, latter being appropriately tested by cross-examination).

[10] The right to confrontation guaranteed by the sixth amendment is made applicable to the states through the due process clause of the fourteenth amendment. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[11] In *Davis*, the court held that the victim's statements to the 911 operator while the emergency was unfolding were nontestimonial and could be admitted because they were given for the primary purpose of responding to the emergency. *Davis* v. *Washington*, supra, 547 U.S. 829. In contrast, statements given after the defendant fled, in response to targeted questions by the 911 operator, were testimonial and, therefore, inadmissible because they were provided after the emergency had passed for the primary purpose of developing evidence against an accused. Id., 828–29.

[12] The plurality rested its holding on two independent grounds. See *Williams* v. *Illinois*, supra, 567 U.S. 58, 86. The first ground, irrelevant to the present case, was that the out-of-court statements were not hearsay under traditional rules of evidence. Id., 57–58 (plurality opinion). It reasoned that the expert relayed those statements solely for the purpose of explaining the assumptions on which the expert's opinion rested. Id., 56–58 (plurality opinion). The plurality thus concluded that the statements were not offered for their truth and therefore would fall outside the scope of the confrontation clause. Id., 58. Five justices disagreed with this reasoning. Id., 104–109 (Thomas, J., concurring in the judgment); id., 125–33 (Kagan, J., dissenting).

[13] Although Angon presumably could have identified the Waterbury Police Department employee from his "office" who relayed the inspection information to him, he was not asked to identify that person. It is unclear whether this information was elicited, and in turn communicated, by someone serving in a law enforcement capacity or in a purely administrative capacity. Angon also was not asked whether this person was aware of the potential relevance of this information.

We note that neither party has provided this court with any case law addressing testimonial hearsay in the context of one police officer relaying the statement of a third party to another officer. Nonetheless, we are mindful of the United States Supreme Court's admonition that "we do not think it conceivable that the protections of the [c]onfrontation [c]lause can readily be evaded by having a [note taking] policeman recite the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." (Emphasis omitted.) *Davis* v. *Washington*, supra, 547 U.S. 826. In *Williams*, the four dissenting justices acknowledged Justice Thomas' view that "the [c]onfrontation [c]lause reaches [bad faith] attempts to evade the formalized process"; *Williams* v. *Illinois*, supra, 567 U.S. 113 (Thomas, J., concurring in the judgment); but noted that he "provides scant guidance on how to conduct this novel inquiry into motive." Id., 140 n.7 (Kagan, J., dissenting). There is nothing in the record before us, or in logic, tending to suggest that Angon or any other police officer intentionally elicited the inspection information informally to avoid the confrontation issue. A certified copy of the record would have avoided both the confrontation and hearsay issues.

[14] It also seems implausible that the four strangers would have driven off together to allow the defendant to view Paul's vehicle rather than meet where Paul's car purportedly was located a short distance away or have Paul's car brought to the gas station.

[15] In his brief, the defendant devotes the majority of his argument addressing whether the Appellate Court correctly concluded that only three of eleven actions on the part of the prosecutor constituted prosecutorial impropriety. Although the state asserted in its brief that the certified issue before this court is limited to whether the three improprieties identified by the Appellate Court deprived the defendant of his right to a fair trial, the state conceded at oral argument that this court may review all of the defendant's additional claims that were raised and rejected, by the Appellate Court. We agree with the Appellate Court that the eight additional claims of prosecutorial impropriety are without merit and do not warrant further analysis.

See *State* v. *Sinclair*, supra, 173 Conn. App. 16 and n.2.